U. S. DISTRICT COURT
N. D. OF N. Y.
FILED

MAY  3 2005

AT _____ O'CLOCK ____M
LAWRENCE K. BAERMAN, Clerk
UTICA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

vs                                           1:04-CR-313

JOHN E. HOWARD, III; REDMOND ANDRE
MCKINNON, aka Born Prince; WILLIAM
PENDELTON, aka Kashiem; ROLAND
RIGGINS; GLENN SMITH, JR., aka Kabar;
DANIEL WILLIAMS; KENNETH GIBSON, aka KG;
CHRISTOPHER RESTIFO; SANTIAGO CASTILLO,
aka Victor; AFFIS D. CRUZ; and JULIO SIERRA,
aka "P,"

                                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -
APPEARANCES:                          OF COUNSEL:

HON. GLENN T. SUDDABY                 TERRENCE M. KELLY, ESQ.
United States Attorney               THOMAS A. CAPEZZA, ESQ.
Northern District of New York        Assistant U.S. Attorneys
P. O. Box 7198
100 South Clinton Street
Syracuse, New York  13261-5165

JAMES E. LONG, ESQ.
Attorney for Defendant John E. Howard, III
668 Central Avenue
Albany, New York 12206

CASTILLO & ASSOCIATES                 GASPAR M. CASTILLO, ESQ.
Attorneys for Defendant Redmond Andre McKinnon
817 Madison Avenue
Albany, New York 12208-3302

OFFICE OF THE FEDERAL
    PUBLIC DEFENDER                    PAUL J. EVANGELISTA, ESQ.
Attorney for Defendant William Pendelton
39 North Pearl Street, 5th Floor
Albany, New York 12207

MICHAEL A. FEIT, ESQ.
Attorney for Defendant Roland Riggins
383 Clinton Avenue
Albany, New York 12206

RICHARD L. MOTT, ESQ.
Attorney for Defendant Glenn Smith, Jr.
600 Broadway
Albany, New York 12207

JULIO HERNANDEZ, III, ESQ.
Attorney for Defendant Daniel Williams
105 Jordan Road
Troy, New York 12180

DENNIS B. SCHLENKER, ESQ.
Attorney for Defendant Kenneth Gibson
174 Washington Avenue
Albany, New York 12210

KINDLON SHANKS LAW FIRM                        TERRENCE L. KINDLON, ESQ.
Attorneys for Defendant Christopher Restifo
74 Chapel Street
Albany, New York 12207

EUGENE Z. GRENZ, ESQ.
Attorney for Defendant Santiago Castillo
113 Great Oaks Boulevard
Albany, New York 12203-5954

RAMON W. PAGAN, ESQ.
Attorney for Defendant Affis Cruz
2460 Williams Bridge Road
Bronx, New York 10469

TELESFORO DelVALLE, JR., ESQ.
Attorney for Defendant Julio Sierra
41 Madison Avenue
New York, New York 100010-2202


DAVID N. HURD
United States District Judge

## TABLE OF CONTENTS

INTRODUCTION ............................................................. 5

BACKGROUND ............................................................. 5

   March 19, 2004, Eavesdropping Warrant:  518-229-6128 ..................... 5

   April 21, 2004, Eavesdropping Warrant:  518-528-1148 and 518-376-3946 ...... 11

      McKinnon's Cell Phone ........................................ 11
      Howard's Cell Phone .......................................... 14
      Necessity--Alternative Investigative Techniques .................... 15

   May 20, 2004, Eavesdropping Warrant ................................ 16

      McKinnon's and Cruz's Cell Phones ............................. 17
      Sierra's and Howard's Cell Phones .............................. 18
      Howard's and Castillo's Cell Phones ............................. 19
      McKinnon's and E & O's Cell Phones ........................... 20
      Necessity--Alternative Investigative Techniques .................... 23

   June 1, 2004 Search Warrant .................................... 23

   May 20, 2004 Vehicle Stop of Howard and Restifo .................... 24

STANDARDS ............................................................ 24

   Eavesdropping Warrants ....................................... 25
   Probable Cause .............................................. 28
   Severance ................................................... 28
   Dismissal of the Indictment and Inspection of Grand Jury Minutes ............. 29

DISCUSSION ........................................................... 29

   Defendant John E. Howard, III .................................. 29

      Warrantless Vehicle Search .................................. 29
      Evidence Obtained through Eavesdropping ....................... 30
         Standing ............................................. 30
         Probable Cause ....................................... 31
         Traditional Investigative Techniques ....................... 34
      Severance ................................................ 35

Defendant Redmond Andre McKinnon ................................... 35

    Dismissal of the Indictment ....................................... 35
    Eavesdropping Warrant ......................................... 36
        Standing ................................................. 36
        Traditional Investigative Methods .......................... 37
        Probable Cause .......................................... 38
    Search Warrant ............................................... 42
    Discovery ..................................................... 43
    Supplemental Motion .......................................... 43

Defendant Glenn Smith, Jr. ........................................... 45

    Severance .................................................... 45
    Wiretap Warrant ............................................... 46
    Discovery ..................................................... 47
    Removal of Alias "Kabar" from Superseding Indictment ................ 47

Defendant Kenneth Gibson ........................................... 47

    Warrantless Search of Residence at 152 Maple Avenue ............... 47
    Eavesdropping Warrants ........................................ 48
    Severance .................................................... 49
    Motion to Preclude Certain Testimony ............................ 50

Defendant Christopher Restifo ........................................ 50

Defendant Affis Cruz ................................................ 52

Sentencing Factors in the Superseding Indictment ......................... 53

Further Motions as Necessary ........................................ 53

CONCLUSION ....................................................... 53

**MEMORANDUM-DECISION and ORDER**

## I. INTRODUCTION

The defendants were charged with narcotics trafficking offenses in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1), in a superseding indictment dated July 28, 2004. The grand jury also charged parallel forfeiture counts, and set forth conduct relevant to sentencing under the United States Sentencing Guidelines. Defendants John E. Howard III ("Howard"), Redmond Andre McKinnon ("McKinnon"), Glenn Smith, Jr. ("Smith"), Kenneth Gibson ("Gibson"), Christopher Restifo ("Restifo"), and Affis Cruz (Cruz") filed motions for omnibus relief.[1]  The Government opposed.

Oral argument was heard on January 27, 2005, in Albany, New York.  Decision was reserved.

McKinnon filed a supplemental motion to suppress subsequent to oral argument, with permission.  The Government responded in opposition.

## II. BACKGROUND

### A. March 19, 2004, Eavesdropping Warrant:  518-229-6128

On March 19, 2004, Terrence M. Kelly ("Kelly"), Assistant United States Attorney, Northern District of New York, applied for a warrant authorizing interception of communications on cellular telephone 518-229-6128 ("Gibson's cell phone").  The warrant application was supported with the affidavit of Brian D. Cernak ("Cernak"), a Special Agent with the United States Drug Enforcement Administration.  The communications of McKinnon and Gibson were expected to be intercepted as a result of the wiretap of Gibson's cell phone.

---

[1]  Defendant William Pendelton ("Pendelton") also filed an omnibus motion.  However, he subsequently changed his plea to guilty.

Further, the application indicated that narcotics trafficking by Smith, McKinnon, defendant Daniel Williams ("Williams"), and Gibson was being investigated. The following facts are set forth in Cernak's affidavit.

In April 2003, a confidential informant ("CI #1") made a controlled purchase, observed by law enforcement personnel, of 54.9 grams of cocaine from one Richard Anderson ("Anderson").  CI #1 paid $1,150 for the cocaine.  Defendant Williams supplied cocaine to Anderson.  After the transaction, law enforcement surveilled Williams to 429 Duane Avenue, Schenectady, New York.

On May 30, 2003, a confidential informant ("CI #2") called defendant Williams at 518-858-6057 ("Williams' cell phone") to arrange a purchase of $250 worth of cocaine.  CI #2 purchased 32.7 grams of cocaine at 429 Duane Avenue.  A white Infinity registered to Williams was parked at this address while the transaction took place.  On June 4, 2003, CI #2 again called Williams on his cell phone to arrange to purchase cocaine for $250.  CI #2 purchased 33.7 grams of cocaine on this occasion.

In September 2003 a confidential informant ("CI #3") was interviewed by law enforcement personnel.  CI #3 stated that in the late spring and early summer of 2003 he made many purchases of cocaine from a person he knew as "Kabar."  CI #3 would call Kabar at 518-378-5434 to arrange a purchase of cocaine.  The transaction would take place at 202 Furman Street, Schenectady.  Kabar told CI #3 that his source was defendant McKinnon, who purchased his cocaine in kilogram quantities in New York City.  CI #3 knew Kabar's first name was Glenn, a vehicle registered to defendant Smith had been observed parked at 202 Furman Street, and Smith had been observed driving that car.  New York State Department of Motor Vehicles records revealed that Smith resides at 202 Furman

Street.  CI #3 had plead guilty to state offenses relating to about 18 ounces of cocaine, and declined to cooperate further.

On January 16, 2004, at 8:35 p.m. an individual was arrested in Schenectady in the possession of about 41 grams of cocaine.  The individual admitted that he purchased the cocaine from defendant Gibson, and he had been obtaining cocaine from Gibson since late summer 2003.  He would call Gibson's cell phone when he wanted to make a purchase of cocaine.  He paid $1,000 per ounce for the cocaine he purchased.  Telephone records show that between December 26, 2003, and January 26, 2004, twenty-four calls took place between the arrested individual's telephone and Gibson's cell phone.  One such call occurred at 6:56 p.m. on January 16, 2004 (about 1-1/2 hours prior to the individual's arrest).

Nextel business records indicate that defendant Gibson's cell phone is listed to Noui Bouasay ("Bouasay-Gibson")[2], 152 Maple Avenue, Glenville, New York.  Niagara Mohawk records show that it provides service to Noui Bouasay-Gibson at 152 Maple Avenue.  A vehicle registered to Gibson was observed by law enforcement parked in the driveway at 152 Maple Avenue.

On January 28, 2004, a confidential source told Cernak that defendants McKinnon and Gibson trafficked in kilogram quantities of cocaine.  This source also stated that Gibson used his cell phone (518-229-6128) to conduct narcotics trafficking.

Telephone pen registers and trap and trace information showed frequent contact amongst the telephones of defendants Gibson, McKinnon, Smith, Howard, and Williams.  Between mid-December 2003 and mid-February 2004, the following calls were made, among

---

[2] Bouasay-Gibson is Gibson's wife.

others:  227 calls between 518-470-3799 ("Smith's cell phone") and two cellular telephones registered to Howard; 28 calls between Smith's cell phone and Williams' cell phone; 31 calls between 518-372-6983 (a telephone billed to 1010 Regent Street, McKinnon's residence) and Williams' cell phone; and 26 calls between the 1010 Regent Street telephone and Gibson's cell phone.  Between February 4, 2004, and March 18, 2004, 187 calls were made between Williams' cell phone and two cellular telephones registered to Howard and 27 calls were made between Gibson's cell phone and a number registered to Howard.  Between December 15, 2003, and March 18, 2004, there were 214 calls between the McKinnon telephone at 1010 Regent Street and telephones billed to Howard at 516 Mumford Street.

Additionally, physical surveillance by law enforcement established some locations and activities of the alleged conspirators.  For example, law enforcement surveilled 1010 Regent Street, frequented by defendant McKinnon; 516 Mumford Street, frequented by McKinnon and defendant Howard; 202 Furman Street, frequented by defendant Smith; 454 Brandywine, frequented by defendant Williams; and 152 Maple Avenue, frequented by defendant Gibson.  Agent Cernak noted that each of these locations with the exception of 152 Maple Avenue were residential, where a person sitting in a vehicle would be noticed.  Maple Avenue is a high volume suburban street on which parking is not permitted.  Further, the Regent Street, Mumford Street, and Brandywine locations were such that vehicles could pull into the driveway and out of view of any surveillance.  Finally, Cernak stated that controlled purchases by informants had been surveilled by law enforcement.

Agent Cernak opined that continued surveillance would be noticed, causing the targets of the investigation to be more cautious, to flee, to change their methods of operation including communications devices, and/or threaten the safety of informants.  He also noted

- 8 -

that continued surveillance would not establish the roles of the conspirators nor the scope of the alleged offenses.

Agent Cernak went on to opine that grand jury testimony was unlikely to succeed, because the conspirators would be unlikely to cooperate and would invoke the Fifth Amendment right against self-incrimination. Providing immunity for testimony would be unwise because it could foreclose prosecution of the most culpable people, and could not ensure truthful testimony. Finally, Cernak opined that service of grand jury subpoenas would alert the conspirators to the investigation.

Agent Cernak next discussed the use of confidential informants and cooperating sources, opining that they would not yield evidence necessary to the investigation. These sources of information were on the fringe of the conspiracy, without direct contact to those mid- to high-level in the organization. CI #3 was to be incarcerated for many years and therefore would no longer be in a position to make controlled purchases of cocaine from defendant Smith. CI #1 and CI #2 stopped cooperating with law enforcement. Two other sources were incarcerated and declined to cooperate further. The source that told Cernak that defendants McKinnon and Gibson trafficked in kilogram quantities of cocaine and that Gibson used 518-229-6128 to conduct narcotics trafficking was willing to cooperate, but was unlikely to be able to infiltrate the organization.

Agent Cernak stated that they had not been able to infiltrate the conspiracy with undercover officers. He opined that even if an undercover agent could infiltrate, it would not be in a position high enough in the organization to yield the evidence needed.

Use of interviews of the subjects of the investigation or their associates also would be unlikely to successfully result in evidence necessary to the investigation. Cernak opined,

based upon his extensive experience, that the response to attempts at such interviews could include untruths to divert the investigation; alert the conspirators to the investigation which would compromise the investigation because of possible destruction or concealment of documents and other evidence; and possible harm to cooperating sources.

Agent Cernak stated that probable cause did not exist upon which a search warrant could be based. He noted that at this stage of the investigation, law enforcement did not know the location of the cocaine or of the monetary proceeds of the narcotics trafficking.

Finally, Cernak outlined the useful information obtained by pen registers, telephone toll records, and telephone traps and traces. These investigatory methods verified frequent contact, but not the identity of the parties or the nature and substance of the conversations. Using these methods, law enforcement could not differentiate between legitimate calls and calls in furtherance of the criminal activity. Finally, these methods did not permit identification of the source of the controlled substances or establish proof that the conspiracy existed.

Based upon the foregoing, Hon. Lawrence E. Kahn, United States District Judge, ("Judge Kahn") found that there was probable cause to believe that particular wire communications of defendants Gibson, McKinnon, Williams, and others concerning cocaine distribution would be obtained through the interception of wire communications to and from Gibson's cell phone, and that probable cause existed to believe that Gibson's cell phone was used in the commission of narcotics trafficking offenses. Accordingly, he issued a warrant permitting eavesdropping of communications to and from Gibson's cell phone.

## B. April 21, 2004, Eavesdropping Warrant:  518-528-1148 and 518-376-3946

On April 21, 2004, AUSA Kelly applied for a warrant authorizing continued interception of communications on defendant Gibson's cell phone as well as interception of communications on cellular telephone 518-376-3946 ("Howard's cell phone") and cellular telephone 518-528-1148 ("McKinnon's cell phone").  The warrant application was supported with the affidavit of Agent Cernak, and incorporated everything set forth in the March 19, 2004, warrant application.  The communications of defendants McKinnon, Gibson, Williams, and Smith; and individuals Brian Last Name Unknown ("Brian"), Frank Dicipio ("Dicipio"), Jacob O'Donnell ("O'Donnell"), Bouasay-Gibson, and others were expected to be intercepted as a result of the continued wiretap of Gibson's cell phone and the wiretap of Howard's and McKinnon's cell phones.  Further, the application indicated that narcotics trafficking by McKinnon, Gibson, Williams, Smith, Brian, Dicipio, O'Donnell, Bouasay-Gibson, and others was being investigated.

Agent Cernak related some conversations intercepted pursuant to the March 19, 2004, wiretap warrant.  He then expressed his opinion as to the meaning of the coded language used during some of the calls.  For the sake of brevity, the coded language contained in the conversations is not set forth below.  Rather, only Cernak's opinion as to the actual meaning of the conversations is set forth.  Further, although the times of each intercepted conversation are set forth by Cernak, only those times with apparent significance are set forth below.

### 1. McKinnon's Cell Phone

On March 19, 2004, defendant Gibson called defendant McKinnon.  Gibson told McKinnon that he had obtained some marijuana, and McKinnon should stop by.  On March

26, 2004, McKinnon called Gibson, asking if Gibson could stop by on his way to work. Agent Cernak opined that McKinnon wanted to increase the amount of cocaine he provided to Gibson for distribution. Gibson asked if he was talking about a whole kilogram. McKinnon responded that the amount was what they had previously discussed.

On March 27, 2004, at 2:30 p.m., defendant Gibson called Dicipio, and the two agreed to meet later. At 2:10 p.m. and 3:09 p.m. Gibson left messages on defendant McKinnon's cell phone, saying to call him. At 3:16 p.m. Gibson called McKinnon. In Cernak's opinion, Dicipio ordered a quantity of cocaine from Gibson, then Gibson attempted to call McKinnon to arrange to pick up the cocaine.

On March 30, 2004, an unidentified male called Gibson. Cernak opined that in this conversation, the male was attempting to obtain cocaine from Gibson. On April 2, 2004, Gibson called Brian. According to Cernak, Brian expressed his desire to purchase both cocaine and marijuana. Gibson replied that he only had one available.

On April 4, 2004, McKinnon called Gibson. In Cernak's opinion, the conversation centered around two searches of Derrick Miles ("Miles") by the Drug Enforcement Administration during which marijuana was seized. Cernak stated that facts demonstrated that Miles was Gibson's marijuana supplier.

On April 5, 2004, Gibson called Dicipio. According to Cernak, Dicipio was ordering a quantity of cocaine, and told Gibson that he had the money.

A pen register/trap and trace device on defendant McKinnon's cell phone showed that at 1:13 p.m. on April 6, 2004, a call was placed from that phone to 518-878-1610 ("-1610"), another cellular telephone used by defendant Gibson. At 1:15 p.m. Gibson left his residence at 152 Maple Avenue. At 1:26 p.m. he arrived at 1010 Regent Street. At 1:48

p.m. Gibson exited the residence at 1010 Regent Street with a backpack. McKinnon's vehicle was parked at 1010 Regent Street during the time Gibson was inside. At 2:57 p.m. a call was made from -1610 to McKinnon's cell phone. Cernak opined that McKinnon called Gibson to arrange for Gibson to pick up cocaine. Gibson then went to McKinnon's residence and picked up the cocaine.

On April 6, 2004, at 11:57 a.m. Gibson called a male at 518-221-6128 (billed to Jacob O'Donnell). Cernak opined that the conversation was Gibson arranging distribution of the cocaine he was to receive from McKinnon. At about the same time Gibson called a male at 518-377-8049. Cernak opined that this conversation was also to arrange delivery of cocaine.

On April 7, 2004, at 11:46 a.m. defendant Gibson called a male, probably O'Donnell. At about the same time Gibson left his residence at 152 Maple Avenue carrying a yellow plastic bag. While he was driving, he removed a backpack from the back seat. At about 12:05 a male exited a pick-up truck and sat in Gibson's vehicle. After a few minutes the male returned to his truck. Cernak opined that the telephone call was to arrange a purchase of cocaine, which law enforcement surveillance observed.

On April 7, 2004, Bouasay-Gibson called Gibson on his cell phone. Cernak opined that they discussed Gibson having cocaine secreted in the basement of their residence.

On April 8, Gibson called a male at 518-506-1693. According to Cernak, this conversation regarded arranging a sale of cocaine.

On April 9, at 12:05 p.m. a call from -1610 was placed to defendant McKinnon's cell phone. According to a pen register, the call lasted 35 seconds. At 12:14 p.m. defendant Gibson was observed by law enforcement exiting 152 Maple Avenue with a green knapsack.

He entered his vehicle and drove.  He arrived at 25 James Street, Schenectady, at about 12:33 p.m.  At 12:35 p.m. a male exited from 25 James Street and sat in Gibson's vehicle.  The male exited Gibson's vehicle at 12:37 p.m.  Gibson then drove to 516 Mumford and entered the residence.  Earlier on April 8, 2004, McKinnon's vehicle had been observed in the driveway at 516 Mumford.  At 12:40 p.m. another call was placed from -1610 to McKinnon's cell phone.  This call lasted 16 seconds.

On April 9, 2004, a male called Gibson's cell phone.  Cernak opined that the male was telling Gibson that he had the money proceeds from cocaine previously distributed.

Trap and trace equipment demonstrated that there was frequent contact between McKinnon's cell phone, defendant Williams, and defendant Smith.  From March 8, 2004, to April 19, 2004, fifty-two calls were made between Smith's cell phone[3] and McKinnon's cell phone.  From March 13, 2004, to April 19, 2004, forty-four calls were made between Williams' cell phone[4] and McKinnon's cell phone.

Nextel business records show that McKinnon's cell phone is billed to defendant Howard at 516 Mumford Street, as is Howard's cell phone.  Both McKinnon's and Howard's cell phones are on the same account.

### 2. Howard's Cell Phone

A pen register and trap and trace device on defendant Smith's cell phone showed 110 calls to or from defendant Howard's cell phone between January 14, 2004 and April 19,

---

[3] The number recorded was 518-378-5640, the currently assigned number for Smith's cell phone. The same electronic serial number was previously assigned to 518-470-3799.  Both are referenced as Smith's cell phone.

[4] Again, at that time the electronic serial number was assigned to 518-858-6057, which is now assigned to 518-858-1622.  Both are referred to as Williams' cell phone.

2004.  A pen register and trap and trace device on defendant Williams' cell phone registered 134 calls to or from Howard's cell phone between February 6, 2004, and April 19, 2004.

Agent Cernak related a series of telephone call interceptions obtained pursuant to an eavesdropping warrant issued by an Onondaga County Court Judge.  He also related facts regarding vehicle interdictions following some of these telephone calls during which, pursuant to search warrants, large amounts of cocaine were recovered.  Cernak opined that these facts demonstrate that two brothers (whose telephone was the subject of the County Court eavesdropping warrant) and defendant Julio Sierra ("Sierra"), also known as "P," were cocaine traffickers.  Cernak further related one conversation during which a male using the brothers' telephone called defendant Howard's cell phone asking for "PR's number."  In a second call to Howard's cell phone, the caller was given a telephone number.  Later, the male called the number previously given and spoke to Sierra.  Cernak opined that the male obtained Sierra's number so that he could contact Sierra to make a purchase of cocaine.

### 3.  Necessity--Alternative Investigative Techniques

Agent Cernak outlined the alternative investigative techniques used, including physical surveillance of 1010 Regent Street, 516 Mumford Street (both frequented by McKinnon), Furman Street (frequented by Smith), 454 Brandywine Avenue (frequented by Williams), and 152 Maple Avenue (frequented by Gibson).  Cernak pointed out that the physical surveillance included controlled purchases as set forth in his previous affidavit.

Agent Cernak also cited problems and limitations with physical surveillance to the same extent as set forth above with regard to the March 19, 2004, warrant application.  Similarly, he discussed the potential use and problems associated with the use of grand jury subpoenas, confidential informants, confidential sources, undercover agents, interviews,

search warrants, and pen register and trap and trace devices.  Finally, he set forth the prior electronic surveillance that has been authorized.

Based upon the foregoing, Judge Kahn found that there was probable cause to believe that particular wire communications of defendants Gibson, Smith, McKinnon, and Williams; and individuals Brian, Dicipio, O'Donnell, Bouasay-Gibson, Miles, and others concerning cocaine distribution would be obtained through the interception of wire communications to and from Gibson's, Howard's, and McKinnon's cell phones, and that probable cause existed to believe that these cellular telephones were used in the commission of narcotics trafficking offenses.  Accordingly, he issued a warrant permitting eavesdropping of communications to and from Gibson's, Howard's, and McKinnon's cell phones.

### C. May 20, 2004, Eavesdropping Warrant

On May 20, 2004, AUSA Kelly applied for a warrant authorizing continued interception of communications on McKinnon's and Howard's cell phones as well as interception of communications on cellular telephone 646-260-8578 ("E & O's cell phone"), cellular telephones 646-852-5838 ("Castillo's cell phone"), 619-789-3080 ("Sierra's cell phone"), and 646-260-0942 ("Cruz's cell phone").  The warrant application was supported with the affidavit of Agent Cernak dated May 20, 2004, and incorporated everything set forth in the March 19, 2004, and April 22, 2004, warrant applications.  The communications of defendants Smith, McKinnon, Gibson, Williams, Howard, Roland Riggins ("Riggins"), William Pendelton ("Pendelton"), and Sierra; and individual Tim Knight ("Knight") and others were expected to be intercepted as a result of the continued wiretap of Howard's and McKinnon's cell phones and the wiretap of E & O's, Castillo's, Sierra's, and Cruz's cell phones.  Further,

the application indicated that narcotics trafficking by Smith, McKinnon, Gibson, Williams, Howard, Riggins, Pendelton, Sierra, Knight, and others was being investigated.

The following facts are set forth in Cernak's affidavit.  Cernak set forth some conversations intercepted pursuant to the April 21, 2004, eavesdropping warrant.  Again, the coded language is not set forth (as it was in the affidavit).  Rather, only Cernak's opinion as to the meaning of a conversation is set forth.

### 1. McKinnon's and Cruz's Cell Phones

On April 23, 2004, defendant McKinnon made a call from his cell phone to a male on defendant Cruz's cell phone.  Cernak opined that they were discussing a potential purchase of cocaine from the male, which McKinnon would make as soon as he had the money together.  They also discussed that defendant Williams was McKinnon's customer, but he gave Williams the man's number so they could deal directly.

Also on April 23, 2004, Williams used his cell phone to call McKinnon.  Cernak opined that Williams told McKinnon about 3 kilograms of high quality cocaine he had obtained.  He also opined that based upon information from a pen register and trap and trace on Williams' cell phone during this time period that Williams had obtained the cocaine from the man using Cruz's cell phone to whom McKinnon spoke.

On April 24, 2004, McKinnon made a call to Cruz's cell phone.  According to Cernak, this conversation centered on arrangements to have a secret compartment put in McKinnon's Toyota Camry, so that he could hide the contraband when he was transporting it from New York City to Schenectady.

A male using Cruz's cell phone called McKinnon on May 6, 2004.  Cernak opined that the male was asking McKinnon when he was coming to New York to get cocaine.

McKinnon responded that he did not want to travel to purchase it--that is why he gave Williams the man's phone number so they could deal directly.  They also discussed if McKinnon was going to bring his Camry to New York to have the concealed compartment installed.

### 2. Sierra's and Howard's Cell Phones

On April 25, 2004, calls were made from defendant Howard using his cell phone to defendant Sierra's cell phone at 12:41 p.m., 3:17 p.m., and 3:21 p.m.  In Cernak's opinion, Howard and the male using Sierra's cell phone were arranging for Howard to travel from Schenectady to New York City to purchase cocaine.  The male said he had four kilograms for sale.  Howard inquired if the price per kilogram remained the same as the last transaction. The male replied that he was trying to get a price break.  Howard noted that if the quality was not good, he would not make the purchase.  The male stated that the price was $24,500 per kilogram.

On May 7, 2004, at 7:41 p.m. Howard again called Sierra.  At 7:44 p.m. Sierra called Howard.  Cernak opined that Howard was complaining that the kilograms of cocaine he had obtained from Sierra weighed less than 1000 grams; one kilogram weighed 43 grams less than 1000 grams.

A pen register and trap and trace device on Sierra's cell phone registered several calls between that cell phone and 518-986-0425, used by an unidentified male.  Cernak interpreted these calls as making arrangements for the male to come to New York City to meet Sierra at his block to purchase cocaine.

### 3. Howard's and Castillo's Cell Phones

On April 24, 2004, defendant Howard used his cell phone to call defendant Castillo's cell phone. Cernak opined that a message was left asking about the availability of cocaine.

On May 4, 2004, Howard used his cell phone to call Castillo's cell phone. During that call, according to Cernak, Howard arranged travel from Schenectady to New York City to purchase cocaine. The male told Howard that he was giving him a good price because of past problems.

On May 6, 2004, a male used Castillo's cell phone to call Howard on his cell phone. According to Cernak, the male was asking Howard to meet him at a shopping complex north of New York City, and to bring the money for cocaine previously delivered to Howard. Howard replied that he was waiting for the money from Smith.

On May 13, 2004, defendant Williams used his cell phone to call Howard. Cernak opined that the conversation was about defendant Riggins discarding 600 grams of cocaine he had received from McKinnon. They also discussed attempting to get information from inside the Schenectady police department so they could find out what the police knew about their conspiracy.

About an hour later on May 13, 2004, the male who ordinarily used Castillo's cell phone used 973-482-3077 to call Howard. Cernak opined that Howard related that he needed to see him to get cocaine, but first he had to correct a problem with his driver's license before driving with cocaine in the car. Howard stated that he wanted to buy a car, and the male said that the concealed compartment in which contraband could be hidden was still being built into the car.

A pen register and trap and trace device on Howard's cell phone registered 87 calls between that phone and Castillo's cell phone between April 30, 2004, and May 8, 2004. A similar device on McKinnon's cell phone registered 14 calls to or from Castillo's phone between April 3, 2004, and March 2, 2004. On May 11, 2004, a similar device registered two calls between Castillo's cell phone and 518-221-4825, which was billed to Knight, 162 Putnam Road, Schenectady. Law enforcement spoke to an informant who had purchased cocaine from someone who had purchased it from Knight.

### 4. McKinnon's and E & O's Cell Phones

On April 28, 2004, at 1:50 p.m. a male using E & O's cell phone called defendant McKinnon's cell phone. A conversation ensued during which it was established that McKinnon was at 1010 Regent Street. Thereafter, law enforcement observed two males arrive at 1010 Regent Street, park in the back, and open the trunk. At 3:25 p.m. two males used E & O's cell phone to call McKinnon's cell phone. The two males told McKinnon that they had detected police surveillance of their earlier meeting with him. Cernak opined that at the meeting the two males delivered cocaine to McKinnon.

At 7:53 that evening, McKinnon used his cell phone to call defendant Williams on his cell phone. They had a discussion and then McKinnon told Williams about the police surveillance at 1010 Regent Street earlier that day. According to Cernak, the discussion centered on the asking price for cocaine. McKinnon asked Williams if he still got cocaine for $25,000 per kilogram. McKinnon said that his brother (Howard) gets cocaine for $24,800 per kilogram.

On May 6, 2004, a male using E & O's cell phone called McKinnon. Cernak opined that McKinnon was telling the male that the cocaine defendants Pendelton and Smith had

was not of the same quality as what he had received.  The male acknowledged the difference.  McKinnon asked if they got poorer quality because they purchased a smaller amount.  The male said no, that he thought Pendelton lost some weight when he made crack from the powder cocaine.

On May 5, 2004, at 4:32 p.m. defendant McKinnon used his cell phone to call defendant Riggins at 518-378-5188.  They had a discussion.  At 4:49 p.m. McKinnon called Riggins again, saying he was "up top" (that is, at 1010 Regent Street).  Law enforcement surveillance observed a 1997 Oldsmobile Bravada arrive at 1008 Regent Street at 5:14 p.m.  At 5:32 p.m. a brown van parked in the driveway of 1010 Regent Street.  A male exited the vehicle and entered 1010 Regent Street.  At 5:35 p.m. McKinnon and another male arrived in a Jeep and they also entered the building.  At 5:40 p.m. the driver of the Bravada exited the vehicle and went into 1010 Regent Street.  He was not carrying anything.  At 5:46 p.m. the driver of the Bravada exited 1010 Regent Street carrying a white plastic bag, which he put on the passenger side in his vehicle.  The driver then went back to the porch at 1010 Regent Street and conversed with McKinnon.  At 5:56 p.m. the driver and McKinnon entered the Bravada.  At 5:59 p.m. McKinnon exited the Bravada.  Shortly thereafter the Bravada left.  Surveillance was not continued.  Department of Motor Vehicles business records indicate that the Bravada was registered to Riggins, 829 Salina Street, Schenectady.

At 6:25 p.m. McKinnon used his cell phone to call Riggins.  Cernak opined that a cocaine transaction occurred between the driver of the Bravada and McKinnon.  McKinnon called Riggins later to ask him to check the weight that he had received, because there may have been a mistake.

On May 6, 2004, at 10:42 a.m. McKinnon used his cell phone to call Riggins. According to Cernak, Riggins related to McKinnon that the cocaine he received weighed less than it was supposed to weigh, using "five percenter" language code for the numbers.

On May 10, 2004, McKinnon called Riggins.  Cernak opined that Riggins told McKinnon that he wanted to purchase one kilogram of cocaine.  McKinnon replied that the price would be $26,000 if he could wait, but if he had to obtain it now it would cost $27,000.

On May 12, 2004, at 2:25 p.m. McKinnon again called Riggins, telling him to come to Mumford Street.  Law enforcement surveillance observed Riggins exiting 146 Mumford Street at 4:05 p.m. carrying a bag.  Riggins drove away in the Bravada, followed by law enforcement.  A uniformed member of the Schenectady police department stopped the Bravada.  However, Riggins fled in the vehicle and threw the bag out the window.  The bag, containing 600 grams of powder and crack cocaine, was recovered by law enforcement personnel.  Riggins eventually crashed the Bravada.  Cernak noted that intercepted conversations reveal that the co-conspirators do not know that the bag of cocaine was recovered.

On May 8, 2004, defendant Pendelton called defendant McKinnon's cell phone. Cernak opined that they were discussing the contact they had with the users of E & O's cell phone, and the fact that Pendelton lost weight when he turned powder cocaine into crack. McKinnon asked Pendelton if he was satisfied with the cocaine he received from McKinnon the night before.

A pen register and trap and trace device on defendant Smith's cell phone registered 160 calls to or from E & O's cell phone between December 14, 2003 and May 8, 2004.

### 5. Necessity--Alternative Investigative Techniques

Agent Cernak again outlined the physical surveillance at Regent Street, Mumford Street, Furman Street, Brandywine, and Maple Avenue, as well as during controlled purchases, and the limitations of physical surveillance. He further discussed grand jury subpoenas, confidential informants, confidential sources, undercover infiltration, interviews, search warrants, and pen register and trap and trace devices. He discussed details about the use and limited success of these traditional investigative techniques and reasons why their future use would not be successful in meeting the goals of the investigation, essentially the same as set forth in the March 19, 2004, eavesdropping warrant application.

Based upon the foregoing, on May 20, 2004, Hon. Gary L. Sharpe, United States District Judge ("Judge Sharpe"), found that there was probable cause to believe that particular wire communications of defendants Smith, McKinnon, Gibson, Williams, Howard, Riggins, Pendelton, and Sierra; and individual Knight and others concerning cocaine distribution would be obtained through the interception of wire communications to and from Howard's, McKinnon's, E & O's, Castillo's, Sierra's, and Cruz's cell phones, and that probable cause existed to believe that these cellular telephones were used in the commission of narcotics trafficking offenses. Accordingly, he issued a warrant permitting eavesdropping of communications to and from Howard's, McKinnon's, E & O's, Castillo's, Sierra's, and Cruz's cell phones.

### E. June 1, 2004 Search Warrant

On June 1, 2004, Agent Cernak applied for and obtained warrants to search 1010 Regent Street (McKinnon's residence); 516 Mumford Street; 514 Paige Street (Howard's residence); 56A West Street, Ballston Spa, New York (Pendelton's residence); 201 Jackson

Avenue, Schenectady (Smith's residence); and a grey Ford Taurus N.Y. CPH 6666.  He also applied for and obtained warrants to search the persons of Howard, McKinnon, Smith, and Pendelton.

### F.  May 20, 2004 Vehicle Stop of Howard and Restifo

On May 20, 2004, a New York State Police investigator observed defendant Howard obtain a knapsack-style bag from a Lexus SUV in the parking log of a large shopping center north of New York City and place it into the trunk of his Acura automobile.  Thereafter, defendant Restifo, who was driving, and Howard were on the New York State Thruway.  An officer pulled over the Acura.  The officer told Howard and Restifo that an elderly woman had phoned the police stating that her car had been run off the road by a vehicle described as the Acura.  The officer then took Howard and Restifo to the police station ostensibly so that the woman could make a positive identification.  They left their locked car where it was. Meanwhile, the New York State police searched the Acura (without a search warrant) and discovered the bag in the trunk. The bag contained 1300 grams of cocaine and $20,100. The purported woman who made the complaint never showed up at the police station, and the police returned Howard and Restifo to their car.  No traffic tickets were issued.

### III.  STANDARDS

The following standards are applicable to more than one defendant.  Where a standard applies to only one defendant, it is set forth in the section regarding that defendant's motion.

## A. Eavesdropping Warrants

The Omnibus Crime Control and Safe Streets Act, as amended, governs the interception of wire, oral, and electronic communication. See 18 U.S.C. §§ 2510-22. Certain designated federal officials are authorized to apply to a Federal judge for an eavesdropping warrant.[5] Id. § 2516(1). Such an order may be granted in conformity with Section 2518, which sets forth the procedure for the interception of wire, oral, and electronic communication. Id. The principal prosecuting attorney of any State or political subdivision of a State, if authorized by State Statute to apply to a State court judge of competent jurisdiction for an eavesdropping warrant, may apply to a State judge for such a warrant, which may be granted in conformity with Section 2518.[6] Id. § 2516(2).

The identity of the investigator making the application and the officer authorizing the application must be set forth. 18 U.S.C. § 2518(1)(a) (2000). A full and complete statement of the facts and circumstances upon which the applicant based the justification for such an order is required. Id. § 2518(1)(b). The statement must include details about the offense, a particular description of where the interception is to be made, a particular description of the type of communications to be intercepted, and the identity of the person

---

[5] Certain officials such as the Attorney General and Deputy Attorney General are authorized to make the application for a warrant to be executed by the Federal Bureau of Investigation or other responsible Federal agency when evidence of the commission of certain offenses, such as those relating to enforcement of the Atomic Energy Act, dealing with restrictions on payments to labor organizations, bribery of public officials, et cetera. See § 2518(1)(a)-(p). It is unnecessary to set forth those offenses here, because no defendants challenge issuance of the warrant on this basis.

Further, any attorney for the Government is authorized to apply for a warrant authorizing interception of communications by an investigator or law enforcement officer responsible for the offense investigation, when such interception may or has provided evidence of any Federal felony. Id. § 2518(3). Similarly, the violation of this section is not the basis for any of the defendants' motions.

[6] Again, it is unnecessary to specify the offenses that may provide a basis for the warrant application, which are set forth in the statute. See § 2518(2).

committing the offense and whose communications will be intercepted.  Id. § 2518(1)(b)(i)-(iii).

In addition to the factual basis justifying the warrant, the application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  Id. § 2518(1)(c).  The time period for which the interception must be maintained and information regarding all previous applications involving the same persons, facilities, or places must be included.  Id. § 2518(1)(d)-(e).  An application for an extension of a previous order must include the results so far obtained or a reasonable explanation for why such results have not been obtained.  Id. § 2518(1)(f).  The court may require additional material or testimony.  Id. § 2518(2).

The court may issue an ex parte eavesdropping warrant upon a finding that there is probable cause to believe a person is committing, has committed, or is about to commit an enumerated offense; there is probable cause to believe that particular communications regarding that offense will be intercepted; "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;" and there is probable cause to believe that the facilities or place where the interception will occur "are being used, or are about to be used in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person."  Id. § 2518(3).

Probable cause with regard to a wiretap warrant is determined by the same standard as that regarding a regular search warrant--totality of the circumstances.  United States v. Diaz, 176 F.3d 52, 110 (2d Cir. 1999); see United States v. Rowell, 903 F.2d 899,

901 (2d Cir. 1990) (citing Illinois v. Gates, 462 U.S. 213, 230-32, 103 S. Ct. 2317, 2328 (1983)).  The totality of the circumstances standard applies even where "the underlying investigation leading to prosecution was conducted solely by state officials." Rowell, 903 F.2d at 902; United States v. Pforzheimer, 826 F.2d 200, 204 (2d Cir. 1987).

The order must set forth the identity of the person whose communications will be intercepted if it is known; the nature and location of the facility or place where the interception will occur; a "particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;" the agency authorized to perform the interception and the person who authorized the application; and the time period during which such interceptions are authorized.  18 U.S.C. § 2518(4).  An order may not authorize interceptions for longer than is necessary to achieve the objective, and in any event no longer than thirty days. Id. § 2518(5).  Progress reports may be required by the court. Id. § 2518(6).

An aggrieved person may move to suppress the contents of any intercepted oral or wire communication, along with the fruits of such interception. Id. § 2518(10)(a).  An "aggrieved person" is "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11).  A motion to suppress may be based upon the grounds that "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." Id.  These are the only nonconstitutional bases on which such evidence may be suppressed. Id. § 2518(10)(c).

- 27 -

## B. <u>Probable Cause</u>

As noted above, the same probable cause standard applies to both a wiretap warrant and a regular search warrant. <u>Diaz</u>, 176 F.3d at 110.  Probable cause exists where "the 'totality-of-the-circumstances' indicate a probability of criminal activity." <u>Id.</u> (quoting <u>Illinois v. Gates</u>, 462 U.S. at 230-32, 103 S. Ct. at 2328); <u>Rowell</u>, 903 F.2d at 902.  The determination of probable cause turns on "the assessment of probabilities in particular factual contexts," as it is a "fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules." <u>Rowell</u>, 903 F.2d at 902.   The issuing judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. at 238, 103 S. Ct. at 2332.  If the issuing judge had a "'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing" then the probable cause determination comports with the Fourth Amendment. <u>Id.</u> at 236, 103 S. Ct. at 2331 (quoting <u>Jones v. United States</u>, 362 U.S. 257, 271, 80 S. Ct. 725, 736 (1960)).  On review, it is necessary only to insure that the issuing judge had a substantial basis for finding probable cause.  <u>Id.</u> at 238-39, 103 S. Ct. at 2332.

## C. <u>Severance</u>

"[S]everance, pursuant to Fed. R. Crim. P. 14, should only be granted if there is a serious risk that a joint trial would either compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence," if the defendants were properly joined pursuant to Fed. R. Crim. P. 8.  <u>United States v. Walker</u>, 142 F.3d 103, 110 (2d Cir. 1998).  "A defendant seeking severance must show that the

prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials." Id.

### D. Dismissal of the Indictment and Inspection of Grand Jury Minutes

An indictment is valid on its face where it sufficiently "track[s] the language of the statute and state[s] the time and place (in approximate terms) of the alleged crime." United States v. Pirro, 212 F.3d 86, 92 (2d Cir. 2000). "[A] defendant who objects to the indictment before trial, is entitled to a more exacting review of the indictment than one who waits until after trial to object." Id. An invalid indictment must be dismissed. See id. at 94.

Because "[g]rand jury proceedings carry a presumption of regularity," review of the grand jury minutes is "rarely permitted without specific factual allegations of government misconduct." United States v. Torres, 901 F.2d 205, 232-33 (2d Cir. 1990). "Without specific, credible reasons to doubt the integrity of the prosecutor's conduct, the Court will not permit [d]efendant to review the grand jury minutes, nor take it upon itself to do so." United States v. Bocio, 103 F. Supp. 2d 531, 533 (N.D.N.Y. 2000), aff'd, 8 Fed. Appx. 85 (2d Cir. 2001).

## IV. DISCUSSION

### A. Defendant John E. Howard, III

### 1. Warrantless Vehicle Search

Howard first moves to suppress the cocaine found in the bag in the trunk of his Acura automobile on May 20, 2004. He contends that the warrantless search of his automobile, without his consent, violated the Fourth Amendment. The Government does not argue that, although there was no search warrant, the search was permissible because the officers had probable cause to believe that it contained contraband.

"'Under the automobile exception to the Fourth Amendment warrant requirement, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." United States v. Gagnon, 373 F.3d 230, 235 (2d Cir. 2004) (internal quotations omitted).  Moreover, where such probable cause exists, containers and packages within the vehicle may be searched.  Id.  Thus, the question becomes whether probable cause existed for the officers to search the Acura.

The Government does not set forth facts to support a finding of probable cause. Rather, it asserts that a hearing is required to determine the issue.  Accordingly, an evidentiary hearing will be held to determine if probable cause existed to search the Acura. Decision on Howard's motion to suppress is therefore reserved pending the evidentiary hearing.

### 2. **Evidence Obtained through Eavesdropping**

Second, Howard moves to suppress the evidence obtained through interceptions of communications that were authorized by the three wiretap warrants.  He contends that he has standing as an "aggrieved person" to challenge all three warrants.  See 18 U.S.C. § 2518(10)(a).  The Government argues that Howard has standing to contest only the conversations intercepted over the Howard, Castillo, and Sierra cell phones.

### a. **Standing**

Interceptions of conversations pursuant to the March 19, 2004, warrant regarding Gibson's cell phone were not directed toward Howard.  Further Howard was not a party to any of the intercepted communications obtained pursuant to the March 19, 2004, warrant.

- 30 -

Accordingly, he lacks standing to move to suppress with regard to the March 19, 2004, warrant.

The April 21, 2004, and May 20, 2004, warrants were directed, in part, toward Howard. Accordingly, he has standing to bring a motion to suppress with regard to those warrants. See 18 U.S.C. § 2518(10)(a).

### b. **Probable Cause**

Howard next argues that the warrant applications failed to set forth facts sufficient to establish probable cause.

In support of the April 21, 2004, warrant, the Cernak affidavit set forth multiple conversations[7] among the alleged conspirators indicating that a narcotics trafficking operation was ongoing. Three controlled purchases of cocaine were made in April, May, and June, 2003. During the first defendant Williams provided the cocaine to the seller, who sold it to a confidential informant. The second and third involved calling Williams' cell phone to arrange the purchase, and later observing the purchase.

A confidential informant stated that his supplier (defendant Smith) of cocaine was supplied by defendant McKinnon. The hearsay reliability was bolstered by the fact that the transactions took place at 202 Furman Street, where Smith resides. Smith told the informant that his supplier, McKinnon, obtained kilogram quantities of cocaine in New York City.

---

[7] These conversations were intercepted pursuant to the March 19, 2004, warrant. The content of intercepted conversations pursuant to an earlier warrant for which a defendant lacks standing to challenge cannot be challenged "indirectly by suppressing evidence from the subsequent taps and a search warrant which was secured in part through the same information." United States v. Wright, 524 F.2d 1100, 1102 (2d Cir. 1975). In other words, the earlier warrant cannot be challenged solely because information obtained was used to support a later warrant that could be challenged. See id.

Another individual, in possession of 41 grams of cocaine, stated that he obtained the cocaine from defendant Gibson, and had made multiple purchases from Gibson by calling Gibson's cell phone to arrange the transaction.  Telephone records established that twenty-four calls between the individual's cell phone and Gibson's cell phone were made between December 26, 2003, and January 26, 2004, including one about 1-1/2 hours prior to the individual's arrest.

Other sources also told law enforcement officials that McKinnon and Gibson trafficked in kilograms quantities of cocaine and that Gibson used his cell phone to conduct narcotics trafficking.  Pen register and trap and trace devices showed an unusually high frequency of calls among the telephones of defendants Gibson, McKinnon, Smith, Howard, and Williams.  For example 227 calls in two months were made between Smith's cell phone and two cellular telephones registered and billed to Howard.  During an approximately six-week period 187 calls were made between Williams' cell phone and the two telephones registered to Howard, and 27 calls between Gibson's cell phone and a number registered to Howard.  Further, 214 calls in three months were made between McKinnon's telephone and telephones billed to Howard at 516 Mumford Street.  Physical surveillance established, inter alia, that both McKinnon and Howard frequented 516 Mumford Street.

Sufficient facts were presented in the application for the April 21, 2004, eavesdropping warrant to provide Judge Kahn with a substantial basis for finding that probable cause existed that the targets of the warrant, defendants McKinnon, Gibson, Williams, and Smith; and individuals Brian, Dicipio, O'Donnell, and Bouasay-Gibson were participating in narcotics trafficking activity.

With regard to the May 20, 2004, warrant application, again multiple conversations were set forth indicating illegal drug transactions were being carried out.  Specifically with regard to Howard, On April 24, 2004, Howard called defendant Castillo asking about the availability of cocaine.  On April 25, 2004, Howard made calls to defendant Sierra to arrange a purchase of kilogram quantities of cocaine in New York City.  On May 4, 2004, Howard spoke to Castillo and arranged to travel from Schenectady to New York City to purchase cocaine.  On May 6, 2004, Howard again spoke to Castillo, arranging to meet at a shopping complex north of New York City.  During this conversation, Howard was told to bring the money for cocaine previously delivered to him.  Howard replied that he was waiting for the money from Smith.  On May 7, 2004, Howard spoke with Sierra complaining that the kilograms of cocaine he had purchased weighed less than 1000 grams.  On May 13, 2004, Howard spoke with defendant Williams about defendant Riggins discarding 600 grams of cocaine he had obtained from McKinnon.  They also talked about how to obtain inside information about the Schenectady Police Department.  On the same day, Howard received a call during which he indicated that he wanted to purchase cocaine, but first he had to correct a problem with his drivers license.  They discussed Howard purchasing a car with a concealed compartment built into it.  Further, a pen register and trap and trace device on Howard's cell phone showed 87 calls between his phone and Castillo's cell phone in an eight-day period.

Again, sufficient facts were presented in the application for the May 20, 2004, eavesdropping warrant to provide Judge Sharpe with a substantial basis for finding that probable cause existed that the targets of the warrant, defendants McKinnon, Gibson,

- 33 -

Williams, and Smith; and individuals Brian, Dicipio, O'Donnell, and Bouasay-Gibson, were participating in narcotics trafficking activity.

### c. Traditional Investigative Techniques

Howard's next argument is that the affidavits in support of the warrants were insufficient as to alternative investigative techniques. An eavesdropping warrant application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

Both warrant applications at issue set forth the traditional investigative techniques used and explanations of why they were of limited success or would be unlikely to successfully achieve the goals of the investigation. Detailed analyses of pen register and trap and trace devices were presented. The limitations of those devices were noted. For example, the callers could not be identified and the substance of the conversation could not be determined.

Law enforcement officers also used physical surveillance of Regent Street, Mumford Street, Furman Street, Brandywine Avenue, and Maple Avenue. However, physical surveillance was of limited usefulness because of the location of the places frequented by the alleged conspirators, the possibility of detection, and the deleterious effects detection would have on the investigation. Further, physical surveillance could not reveal the roles of the conspirators, the scope of the alleged offenses, or the location of contraband and proceeds.

Three confidential informants had been used, two of whom made controlled purchases of cocaine. These informants were disinclined to cooperate further. Attempts

were made to obtain information from confidential sources, with limited success.  Further use of confidential informants and sources was possible, but unlikely to be successful to the goals of the investigation because one would not be able to penetrate beyond outskirts of the conspiracy.  Also set forth were the difficulties of using grand jury testimony and interviews of the subjects of the investigation or their associates.

A sufficient showing was made of the traditional techniques of investigation that had been used and the results obtained, as well as an explanation of why alternative investigative techniques would not have been successful if tried.[8]  This statutory requirement was fulfilled with regard to all of the warrant applications.

### 3. Severance

Howard moves for severance under Bruton v. United States, 391 U.S. 123 (1968), due to an incriminating statement of co-defendant Pendelton.  In light of Pendelton's change of plea to guilty, severance under Bruton is moot.

### B. Defendant Redmond Andre McKinnon

### 1. Dismissal of the Indictment

McKinnon first moves to dismiss the indictment arguing that insufficient facts are set forth to form the basis of a conspiracy charge against him, specifically that there is no factual showing of a conspiratorial agreement between him and the other alleged conspirators.  He also contends that insufficient facts appear in the indictment from which he can determine the role he allegedly played in the conspiracy.

---

[8]  Howard cites no authority for his proposition that the necessity requirement is not met because no alternative investigatory methods were directed toward him.  Moreover, pen register and trap and trace devices, traditional investigatory techniques, were used with regard to his telephone.  Additionally, physical surveillance was conducted of 516 Mumford, an address at which Howard was billed for his and McKinnon's cell phones.

A defendant "'who deals in large quantities of narcotics may be presumed to know that he is a part of a venture which extends beyond his individual participation.'" United States v. Valencia, 226 F. Supp. 2d 503, 510 (S.D.N.Y. 2002), aff'd, 100 Fed. Appx. 17 (2d Cir. 2004) (quoting United States v. Murray, 618 F.2d 892, 901 (2d Cir. 1980) (internal quotation omitted)).  Further, "a defendant can be guilty of conspiracy without knowing the identities of the co-conspirators." Id.

The superseding indictment alleges that the conspirators obtained large quantities of cocaine in New York City and had them transported to Schenectady and Ballston Spa in "bulk quantity." (Super. Indictment ¶ 1.)  It also alleges that the conspirators broke down the drugs into smaller quantities for redistribution. Id. ¶ 2.  Because of the alleged large quantities of narcotics alleged, McKinnon may be presumed to know that the drug distribution network of which he was a part extended beyond himself. See Valencia, 226 F. Supp. 2d at 510.  Moreover, even if the superseding indictment did not name his alleged co-conspirators it would provide sufficient notice of the conspiracy. See id.  Thus, the superseding indictment sufficiently alleges a conspiratorial agreement as well as notice of McKinnon's alleged role.

## 2. Eavesdropping Warrant

### a. Standing

McKinnon moves to suppress the fruits of all three eavesdropping warrants.  The Government argues that he has standing only to contest the conversations intercepted over the Gibson, McKinnon, Howard, E & O, and Cruz cell phones.

As the Government concedes, McKinnon has standing to challenge the March 19, 2004, eavesdropping warrant, as he was a party to calls intercepted on Gibson's cell phone. With regard to the April 22, 2004, and May 20, 2004, eavesdropping warrants, clearly

McKinnon was a party to communications intercepted pursuant to those warrants. Therefore, McKinnon has standing to challenge the issuance of all three eavesdropping warrants.

### b. Traditional Investigative Methods

McKinnon contends that the warrant applications fail to adequately show that eavesdropping was necessary due to the failure or futility of traditional investigative methods. He argues that traditional techniques used, including physical surveillance, confidential informants and cooperating sources, and controlled purchases of narcotics, had proven successful and would have been if continued. He further argues that the applications make the conclusory assertion that only with wiretapping would the goals of the investigation be achievable.

In the March 19, 2004, warrant application, Agent Cernak set forth detailed information about the use of three confidential informants and controlled purchases made by them. He also noted that these informants declined to cooperate further with law enforcement. Other sources of information also were discussed, including two sources who stated that defendant Gibson used his cell phone to arrange narcotics transactions. One of these sources stated that McKinnon and Gibson trafficked in kilogram quantities of cocaine. Cernak noted that one source was willing to cooperate further; however, he was not in a position to infiltrate the organization to the extent necessary to achieve the goal of the investigation. Cernak also discussed the inability to infiltrate the organization with undercover officers, and opined that even if it was possible the undercover officer would be unable to obtain information about the higher echelons of the organization.

Additionally, Cernak opined that interviews of the subjects of the investigation or their associates would not be successful for a number of reasons.  For example, interviews may cause the subjects to become more cautious and interviewees might give false information in order to divert the investigation.  Cernak cited the lack of probable cause for a search warrant at this stage of the investigation, since the location of the cocaine and the proceeds was unknown.  Finally, he noted that pen registers, toll records, and traps and traces had been used successfully, but their importance to the investigation was necessarily limited by their technological restrictions.  For example, the numbers called could be identified, but the identity of the speakers and the substance of their conversations could not be determined.

With regard to the April 22, 2004, and May 20, 2004, applications, Cernak again detailed the traditional investigative techniques that had been used with limited success, in part due to the nature of the techniques, as set forth above with regard to Howard's motion. In sum, the warrant applications established that other investigative procedures were tried and failed to achieve the goal of the investigation or reasonably appeared to be unlikely to succeed if tried.

### c. **Probable Cause**

Next McKinnon argues that the eavesdropping warrants were not supported by probable cause.

The March 19, 2004, eavesdropping warrant application sought to intercept communications on defendant Gibson's cell phone, in order to obtain evidence of alleged narcotics trafficking by defendants Smith, McKinnon, Williams, and Gibson.  Information was set forth linking McKinnon to the other alleged co-conspirators and the suspected narcotics

- 38 -

trafficking.  Confidential informants established that Williams and Smith were selling cocaine. One confidential informant indicated that Smith told him that McKinnon was his source of cocaine.  In January 2004, an individual arrested in possession of 41 grams of cocaine identified Gibson as his source.  Also in January 2004, another source told law enforcement that McKinnon and Gibson trafficked in kilogram quantities of cocaine.  Pen register and trap and trace devices showed an extremely high volume of telephone calls among Gibson, McKinnon, Smith, Howard, and Williams from mid-December 2003, through mid-March 2004. For example, 214 calls were registered between McKinnon's residence at 1010 Regent Street and telephones billed to Howard at 516 Mumford Street.  Further, physical surveillance established that McKinnon frequented 1010 Regent Street, his apparent residence, and he and Howard frequented 516 Mumford Street.  McKinnon owned 516 Mumford Street.  Finally, the application noted that Gibson, Williams, Smith, and McKinnon previously had been convicted of narcotics trafficking offenses.  Thus, sufficient facts were set forth to establish a substantial basis for which Judge Kahn could have determined that probable cause existed that communications intercepted on Gibson's cell phone would yield evidence of narcotics trafficking.

The April 21, 2004, warrant application similarly set forth facts to provide a substantial basis for Judge Kahn's finding of probable cause, as set forth above in the analysis regarding Howard's motion.  Additionally, specifically pertaining to McKinnon, the following facts were set forth in the application.  On March 19, 2004, Gibson and McKinnon conversed regarding marijuana Gibson had obtained and cocaine he was to obtain from McKinnon.  On March 27, 2004, conversations between Gibson, Dicipio, and McKinnon involved Dicipio ordering cocaine from Gibson, who in turn attempted to obtain the cocaine

from McKinnon.  On April 4, 2004, McKinnon and Gibson had a conversation regarding searches of Miles (allegedly Gibson's supplier of marijuana) during which marijuana was seized by law enforcement.  On April 6, 2004, a series of telephone calls and surveillance established that McKinnon provided cocaine to Gibson for distribution.  On April 9, 2004, a telephone call was place from Gibson to McKinnon.  Shortly thereafter Gibson left his residence with a knapsack and drove to an address in Schenectady.  A male sat in Gibson's vehicle for a short time then exited the vehicle.  Thereafter, Gibson drove to 516 Mumford Street.  Trap and trace devices showed frequent contact between McKinnon, Williams, and Smith from mid-March, 2004 to April 19, 2004.  During that time period 52 calls were made between Smith's cell phone and McKinnon's cell phone and 44 calls were made between Williams' cell phone and McKinnon's cell phone.  Thus, sufficient facts were set forth from which Judge Kahn could determine that, based on a totality of the circumstances, probable cause existed.

The May 20, 2004, eavesdropping warrant similarly set forth a plethora of facts implicating McKinnon in the narcotics trafficking conspiracy.  The following facts specific to McKinnon were set forth.  On April 23, 2004, McKinnon called Cruz's cell phone to discuss a cocaine purchase.  They also discussed the fact that defendant Williams was McKinnon's customer, but he was providing Williams with defendant Cruz's cell phone number so they could deal directly.  On April 23, 2004, Williams and McKinnon spoke about 3 kilograms of high quality cocaine.  Trap and trace information indicated that Williams had obtained this cocaine from Cruz.  On April 24, 2004, McKinnon called Cruz's cell phone.  They discussed having a secret compartment built into McKinnon's vehicle, in which he could hide cocaine when transporting it from New York City to Schenectady.

On April 28, 2004, McKinnon received a call from E & O's cell phone.  They conversed and it was established that McKinnon was at 1010 Regent Street.  Law enforcement surveillance observed two males arrive at 1010 Regent Street and enter the building.  Later, two males used E & O's cell phone to call McKinnon, telling him that they had noted police surveillance of their earlier meeting with him.  Cernak opined that during this meeting McKinnon obtained cocaine from the two males.  That evening, McKinnon called defendant Williams, relating to him the police surveillance of the transaction earlier in the day.  They also discussed cocaine transactions, including the going price per kilogram of cocaine.

On May 5, 2004, telephone calls between McKinnon and defendant Riggins and police surveillance of 1010 Regent Street led Cernak to opine that Riggins purchased cocaine from McKinnon.  McKinnon made an error in the weight, and called Riggins to check the cocaine he had received to verify its weight.

A call from Cruz's cell phone to McKinnon on May 6, 2004, took place with regard to McKinnon traveling to New York City to purchase cocaine.  McKinnon stated that he did not want to travel to make the purchase--that is why he gave Williams defendant Cruz's cell phone number.  Also on May 6, 2004, McKinnon received a call from E & O's cell phone. Cernak opined that this conversation was about the lower quality of cocaine that Pendelton and Smith had received.

On May 8, 2004, defendant Pendelton and McKinnon conversed about contact they had with the users of E & O's cell phone.  They discussed Pendelton losing weight when he converted powder cocaine into crack cocaine, and McKinnon inquired if Pendelton was satisfied with the cocaine he had received from McKinnon the night before.

- 41 -

On May 10, 2004, McKinnon and Riggins conversed about a cocaine transaction. McKinnon related that the price for immediate delivery was $27,000 per kilogram, but would be $26,000 if Riggins could wait.

On May 12, 2004, McKinnon and Riggins spoke again.  McKinnon told Riggins to come to Mumford Street.  He was observed exiting 146 Mumford Street carrying a bag.  Law enforcement attempted to stop his vehicle, but Riggins fled in the vehicle, throwing the bag out the window.  The bag, containing 600 grams of powder and crack cocaine, was recovered.  Riggins was eventually taken into custody after crashing his vehicle.

Thus, the May 20, 2004, warrant application set forth sufficient facts to provide a substantial basis for Judge Kahn's finding of probable cause that interception of communications over McKinnon's, Howard's, E & O's, Castillo's, Sierra's, and Cruz's cell phones would yield evidence of narcotics trafficking offenses.

### 3. Search Warrant

McKinnon first argues that the search warrant was based upon information gleaned from the illegal wiretaps and therefore must be suppressed as fruit of the poisonous tree.  As determined above, all three wiretaps met the statutory requirements and constitutional threshold for probable cause therefore the fruits of the search warrant need not be suppressed on this basis.

McKinnon also argues that probable cause was lacking to issue the search warrant. McKinnon asserts that intentional and/or material misrepresentations or omissions may have been made in the supporting affidavits, and the investigating agents failed to act in good faith.  However, there is no factual analysis to support these arguments.  See Franks v. Delaware, 438 U.S. 154, 171, 98 S. Ct. 2674, 2684 (1978) (conclusory attack on affidavit

underlying search warrant insufficient to negate the presumption of validity).  Accordingly, evidence obtained as a result of execution of the search warrant need not be suppressed.

### 4. Discovery

McKinnon seeks an order requiring the Government to provide any materials he is due under Fed. R. Crim. P. 16 (to the extent it has not already done so), Brady, Jencks, and its intention to introduce prior bad acts.  The Government represents that it is not aware of any Brady material, it will provide Jencks and Giglio materials as required, and it does not intend to introduce evidence of prior bad acts.  Although it does not specifically address the preservation of notes, it is assumed that the Government's concessions regarding the other points of discovery specifically with regard to the requirements of Rule 16 apply equally to preservation of original notes as required by Rule 16.  Accordingly, the discovery portion of McKinnon's motion will be denied without prejudice.

### 5. Supplemental Motion

By supplemental motion, McKinnon requests an evidentiary hearing to resolve what appear to be ambiguities in the records of interceptions of calls made to and from McKinnon's cell phone.  The first order to authorize such interceptions was dated April 21, 2004.  The time that the order was executed is not evident from the face of the order.  However, it appears that the Attorney General authorization to apply for the wiretap was faxed to the local United States Attorneys Office at 16:32:00 p.m. on April 21, 2004.

Records provided by the government seem to indicate an interception on McKinnon's cell phone on April 2, 2004, at 16:52:47 (two minute thirty-nine second call); on April 3, 2004, at 11:51:54 (five second call); April 21, 2004, at 00:17:33 (ten second call);

April 21, 2004, at 00:18:21 (29 seconds); April 21, 2004, at 11:27:37 a.m. (nine minute thirty-eight second call); and April 21, 2004, at 11:37:41 a.m. (four minute fifty-nine second call).

The Government conceded that the required authorization to apply for the eavesdropping warrant was received at about 4:30 p.m. on April 21, 2004, and that AUSA Kelly and Agent Cernak thereafter appeared before Judge Kahn to make the application. Kelly notes that the unexecuted documents in support of the application were provided to the court earlier that day, but that the documents were not executed until after the authorization was received.  Nextel confirmed receipt of Judge Kahn's order authorizing the wiretap of McKinnon's cell phone at about 6:36 p.m. on April 21, 2004.

Additionally, the Government submitted the affidavit of Scott MacDowell ("MacDowell"), an Investigator assigned to the CALEA Intercept Unit of the Bureau of Criminal Investigation Unit of the New York State Police.  MacDowell explained that a court order was obtained on April 2, 2004, at 5:35 p.m. authorizing a pen register and trap and trace device on McKinnon's cell phone.  The records referenced by McKinnon for April 2, 3, and 21 (three calls), were records of data obtained pursuant to the pen register and trap and trace device order.  MacDowell noted that each record reflects that there was no audio and no monitor listed.  He compared these records with those of calls intercepted pursuant to a wiretap warrant, which showed "audio" next to the date and time of the call and the intercepting law enforcement officer's name next to "monitor."

The Government has shown that the calls in question were not, in fact, interceptions made prior to issuance of the wiretap warrant.  Rather, they were pen register and trap and trace records obtained pursuant to a valid court order.

### C. Defendant Glenn Smith, Jr.

### 1. Severance

Smith first moves for severance of his trial from that of co-defendants in order to prevent prejudicial spillover.  He argues that as one of two co-defendants not named outside of the conspiracy allegation and one of three defendants whose conduct is alleged at the 500 gram level, the evidence regarding the alleged offenses of the co-defendants would prejudice him.  Further, he argues that the single alleged act by him in furtherance of the conspiracy did not involve the alleged co-conspirators, so that evidence of co-defendants' acts in furtherance would spill over to implicate him.

Here, Smith contends that prejudicial spill over would cause him prejudice, citing United States v. Toliver, 541 F.2d 958, 963 (2d Cir. 1976).  However, Toliver, is inapposite.  Toliver considered the situation where a single conspiracy was alleged, but at trial proof of multiple conspiracies was adduced.  Id. at 962.  The court noted that the "existence of such a 'spill-over' or 'guilt transference' effect . . . turn[ed] in part on whether the numbers of conspiracies and conspirators involved were too great for the jury to give each defendant the separate and individual consideration of the evidence against him to which he was entitled."  Id. at 962-63.  The court found that where only nine persons were indicted and six went to trial, and the number of conspiracies involved could number as many as seven, "the number of conspiracies and conspirators . . was not sufficient to indicate a spill-over effect."  Id. at 963.  In this case, where eleven conspirators were indicted and it appears as though eight will go to trial and only one conspiracy is alleged, insufficient numbers of conspirators and conspiracies are involved to implicate spill-over.  See id. at 962-963.

- 45 -

Other than spill-over, Smith has not identified any other way in which he will be prejudiced by a joint trial, and none is readily apparent.  Moreover, a limiting charge admonishing the jury to consider the evidence as against each defendant separately would preserve Smith's trial rights.  See id. at 963.  Accordingly, severance is inappropriate.

### 2.  **Wiretap Warrant**

Smith argues that he has standing as an "aggrieved person" to challenge all three warrants because he was a party to intercepted conversations.  The Government concedes only that Smith has standing regarding conversations that occurred over defendants McKinnon's, Howard's, and E & O's cell phones.

The March 19, 2004, eavesdropping warrant authorized interception of conversations over defendant Gibson's cell phone.  There is no indication that conversations of Smith's were intercepted pursuant to the March 19, 2004, warrant.  Also, he was not a person toward whom the interception was directed.  Accordingly, he does not have standing to challenge the March 19, 2004, warrant.

The April 22, 2004, eavesdropping warrant was directed to, inter alia, Gibson's and McKinnon's cell phones.  Similarly, the May 20, 2004, warrant authorized interception of conversations over, inter alia, McKinnon's cell phone.  The Government concedes that conversations to which Smith was a party were intercepted over Gibson's and McKinnon's cell phones.  Smith has standing to challenge the latter two eavesdropping warrants.

Smith first contends that probable cause did not exist to issue the warrants.  As set forth above with respect to Howard and McKinnon, ample facts were set forth in the warrant applications to constitute a substantial basis for a finding of probable cause.

Next Smith argues that insufficient facts were set forth to establish that traditional investigative techniques were used but of limited success or unlikely to succeed.  Again, as set forth above with regard to Howard and McKinnon, an ample showing regarding traditional investigative techniques was made in the eavesdropping warrant applications.

### 3. Discovery

In light of the Government's representations that its discovery obligations are being met; that Jencks and Giglio material will be provided as required; it does not plan to introduce prior bad acts or convictions against Smith; and it does not plan to introduce hearsay evidence except co-conspirator statements made in furtherance of the charged conspiracy (admissible under Fed. R. Evid. 802(d)(2)(E)), Smith's discovery motion will be denied without prejudice.

### 4. Removal of Alias "Kabar" from Superseding Indictment

Smith argues that setting forth his alias in the charging instrument is prejudicial because the use of an alias carries a negative connotation long associated with criminal activity.  He conceded that the Government is not limited in identifying Smith with his alias through proof adduced at trial.  Smith cites no authority for this request.  The request will be denied.

### D. Defendant Kenneth Gibson

### 1. Warrantless Search of Residence at 152 Maple Avenue

Gibson argues that a warrantless search of his residence was conducted without probable cause and without consent, necessitating preclusion of the fruits of the search.  The Government contends that consent to search was given.

- 47 -

A consent to search is valid where, under the totality of the circumstances, it was voluntarily given. United States v. Davis, 967 F.2d 84, 86 (2d Cir. 1992). Moreover, a person who shares a residence with another may validly consent to a search of that residence. Id. at 88.

Early in the morning of August 4, 2004, Gibson was arrested at his home pursuant to an arrest warrant signed by Hon. Randolph F. Treece, United States Magistrate Judge, on July 28, 2004. Gibson's wife and daughter, who also resided there, were present at the time. At 8:08 a.m. on August 4, 2004, Bouasay-Gibson (Gibson's wife) signed a Schenectady Police Department Consent to Search. The Consent to Search authorized named law enforcement officers to search the premises of 152 Maple Avenue, Glenville, New York, a 2000 Acura N.Y. CYC 6401, and a 1996 Jeep N.Y. BTT 4950.

As a habitant with joint access and control of the residence, Bouasay-Gibson had authority to consent to the search. Further, there are no facts to indicate that coercion or intimidation played any role in Bouasay-Gibson's consent to search the residence--other than Gibson's bald assertions to the contrary. In the totality of the circumstances, Bouasay-Gibson voluntarily consented to the search.

### 2. Eavesdropping Warrants

Gibson asserts standing as an aggrieved person because he was a party to the intercepted communications. The Government conceded only that Gibson has standing to challenge the wiretap warrants with respect to the Gibson and McKinnon cell phones.

Gibson was a party to conversations intercepted pursuant to the March 19, 2004, April 21, 2004, and May 20, 2004, wiretap warrants. Accordingly, he has standing to challenge these warrants as an aggrieved person.

Gibson argues that the informant's motivation to ameliorate their own situations with regard to criminal proceedings against them militates against their reliability thus diminishing their importance resulting in a totality of circumstances which does not support a finding of probable cause.  As set forth above with regard to the motions of defendants Howard and McKinnon, a plethora of facts were set forth upon which a finding of probable cause could be made.

Gibson next argues that an insufficient showing was made with regard to alternative investigative techniques.  Again, as set forth above regarding Howard's and McKinnon's motions, sufficient detailed factual assertions were made by Agent Cernak from which a finding could be made that other investigative procedures had been tried and failed or that they reasonably appeared to be unlikely to succeed if tried or to be too dangerous.

Gibson also requests that if it is determined that the sealing requirement was not timely met he be permitted to challenge wiretap evidence on that basis.  The Government has established that the sealing requirement was timely met with regard to all three wiretap warrants.  (See Gov. Mem. L., Docket No. 102, Ex. A-C.)

### 3. Severance

Gibson argues that his trial should be severed.   He argues that the single act apart from the conspiracy with which he is charged is unconnected with any of the co-defendants and that the evidence against him is minimal.  He also argues that evidence against his co-defendants will spill-over and the jury may impute some of this evidence to him.  The evidence in the warrant applications alone provides sufficient connection with the conspiracy to make a joint trial more efficient.  See Fed. R. Crim. P. 8(b).  Gibson has not established that there is a "serious risk that a joint trial would compromise" one of his jury trial rights or

"prevent the jury from making a reliable judgment about guilt or innocence." See Walker, 142 F.3d at 110. He has not shown "that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials." See id. Moreover, an insufficient number of conspirators and conspiracies are alleged to implicate spill-over. See Toliver, 541 F.2d 962-63.

### 4. **Motion to Preclude Certain Testimony**

With regard to Gibson's motion in limine, the Government represents that it does not plan to introduce hearsay evidence except co-conspirator statements made in furtherance of the charged conspiracy (admissible under Fed. R. Evid. 802(d)(2)(E)), it does not seek to introduce other crime evidence, it will only seek to introduce Gibson's prior convictions if he should testify, and it intends only to seek to introduce expert testimony on the issues of substance identification and the meaning of intercepted telephone conversations. Accordingly, Gibson's motion in limine must be denied without prejudice.

### E. **Defendant Christopher Restifo**

Restifo first seeks dismissal of the conspiracy count, Count I, of the superseding indictment, or inspection of the grand jury minutes. He contends that there is no evidence that he was aware of the alleged contents of the bag or that there was any agreement with defendant Howard or the other alleged conspirators. Restifo claims he was innocently driving the Acura. Restifo asserts that there is absolutely no mention of him in the detailed descriptions of the alleged activities of the conspirators and their intercepted phone conversations. He also is not mentioned in the forfeiture allegations of the superseding indictment.

The conspiracy count of the superseding indictment is valid on its face as it tracks the language of 21 U.S.C. §§ 846, 841(a)(1) and states that the alleged crime took place approximately August 2003, to about June 9, 2004, in Schenectady County, New York. See Pirro, 212 F.3d at 92. Therefore, dismissal on the basis that the indictment lacked sufficient, valid evidence is inappropriate.

Restifo makes no specific factual allegations of government misconduct with respect to the grand jury. Thus, there is no reason to doubt the prosecutor's conduct before the grand jury, and it would be inappropriate to review the grand jury minutes. See Torres, 901 F.2d at 232-33; Bocio, 103 F. Supp. 2d at 533.

No defects in the institution of the prosecution or in the superseding indictment itself warrant dismissal of Count I of the superseding indictment.

Restifo next seeks suppression of the evidence seized from the trunk of the car without a warrant. As with Howard's motion on this issue, the Government concedes that a factual hearing is required.

Restifo seeks certain discovery. The Government represents that it will meet its Rule 16 obligations, that Jencks and Giglio material will be provided as required, that it is unaware of any Brady material, it does not plan to seek to introduce prior bad acts, and it will seek to introduce evidence of a sale of cocaine by Restifo on April 21, 2004 (as part of the charged conspiracy). Accordingly, Restifo's motion in this regard will be denied without prejudice.

Finally, Restifo seeks severance. As with the other defendants who seek severance, Restifo has not established that there is a "serious risk that a joint trial would compromise" one of his jury trial rights or "prevent the jury from making a reliable judgment

about guilt or innocence." See Walker, 142 F.3d at 110. He has not shown "that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials." See id. Moreover, an insufficient number of conspirators and conspiracies are alleged to implicate spill-over. See Toliver, 541 F.2d 962-63. Accordingly, severance is not warranted.

### F. Defendant Affis Cruz

Cruz seeks dismissal of the superseding indictment for what he contends are insufficient facts about his role in the conspiracy to put him on notice of the allegations against him. However, the conspiracy count of the superseding indictment is valid on its face as it tracks the language of 21 U.S.C. §§ 846, 841(a)(1) and states that the alleged crime took place approximately August 2003, to about June 9, 2004, in Schenectady County, New York. See Pirro, 212 F.3d at 92. Therefore, dismissal on the basis that the indictment lacked sufficient factual allegations is inappropriate.

Cruz next argues that the wiretap interceptions must be suppressed. Cruz contends he has standing as a party to conversations intercepted with respect to all three warrants. The Government concedes he has standing as to only the McKinnon and Cruz cell phones. Cruz was a party to conversations intercepted pursuant to the April 21, 2004, and May 20, 2004, wiretap warrants. He therefore has standing to challenge those two warrants.

His first argument with regard to wiretap warrants is that the necessity requirement was not met. As has been determined in the analysis of the other defendants' motions, the warrant applications contained detailed factual assertions from which a finding could be made that other investigative procedures had been tried and failed or that they reasonably appeared to be unlikely to succeed if tried or to be too dangerous.

His second argument regarding the wiretap warrants is that they were not supported by probable cause.  Again, as determined above, the totality of the circumstances was such that a determination that probable cause existed could be made.

Cruz next moves for certain discovery.  The Government represents that it will comply with its Rule 16 obligations, it will provide Jencks and Giglio material as required, it is not aware of any Brady material, and it does not plan to introduce prior bad acts. Accordingly, Cruz's discovery motions will be denied without prejudice.

### G. **Sentencing Factors in the Superseding Indictment**

In light of United States v. Booker/Fanfan, __ U.S. __, 125 S. Ct. 738 (2005), the sentencing factors are stricken from the superseding indictment.

### H. **Further Motions as Necessary**

All defendants seek permission to make further motions if the need arises resulting from review of information received in discovery.  Such permission is granted.

## V. **CONCLUSION**

An evidentiary hearing is required to determine the propriety of the May 20, 2004, search of defendant Howard's automobile.  A sufficient showing was made in each of the three wiretap applications that traditional investigative techniques had been used with limited success, would be unlikely to be successful, or would be too dangerous, such that each of the wiretap warrants was necessary.  The totality of the circumstances provided a substantial basis for Judge Kahn's and Judge Sharpe's determinations that probable cause existed to issue each of the three wiretap warrants.  As each of the wiretap warrants was properly issued, the search warrant cannot be suppressed as fruit of the poisonous tree.  Based upon the Government's representations, all discovery motions will be denied without prejudice.

Defendants have not made a sufficient showing to make severance appropriate.  The sentencing allegations shall be stricken from the indictment.

The Government established that calls on McKinnon's cell phone were audited pursuant to a pen register and trap and trace warrant.  Conversations were not intercepted prior to issuance of the wiretap warrant.  Therefore, McKinnon's supplemental motion will be denied.

Gibson's wife consented to the search of their residence on August 4, 2004.  Therefore, Gibson's motion to suppress the evidence obtained during the search will be denied.

Accordingly, it is

ORDERED that

1.  With regard to Howard's and Restifo's motions to suppress the warrantless vehicle search of May 20, 2004, decision is RESERVED pending an evidentiary hearing;

2.  Howard's motion to suppress conversations intercepted pursuant to the eavesdropping warrants and for severance is DENIED;

3.  McKinnon's motion to dismiss the superseding indictment, to suppress conversations intercepted pursuant to the eavesdropping warrants, and to suppress evidence obtained pursuant to the search warrant is DENIED;

4.  McKinnon's supplemental motion is DENIED;

5.  Smith's motion for severance, to suppress conversations intercepted pursuant to the eavesdropping warrants, and to remove the alias "Kabar" from the superseding indictment is DENIED;

6.  Gibson's motion to suppress evidence obtained pursuant to the search of his residence at 152 Maple Avenue, to suppress conversations intercepted pursuant to the eavesdropping warrants, and for severance is DENIED;

7.  Restifo's motion to dismiss Count I of the superseding indictment and for severance is DENIED;

8.  Cruz's motion to dismiss the superseding indictment and to suppress conversations intercepted pursuant to the eavesdropping warrants is DENIED;

9.  The sentencing allegations are STRICKEN from the superseding indictment;

10.  All defendants' motions relating to discovery are DENIED without prejudice; and

11.  All defendants may make further motions as may become necessary.

IT IS SO ORDERED.

_____
United States District Court

Dated:   May 3, 2005
         Utica, New York.

- 55 -