UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

               vs                          1:04-CR-313

JOHN E. HOWARD, III; REDMOND ANDRE
MCKINNON, aka Born Prince; WILLIAM
PENDELTON, aka Kashiem; ROLAND
RIGGINS; GLENN SMITH, JR., aka Kabar;
DANIEL WILLIAMS; KENNETH GIBSON, aka KG;
CHRISTOPHER RESTIFO; SANTIAGO CASTILLO,
aka Victor; AFFIS D. CRUZ; and JULIO SIERRA,
aka "P,"
                             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                        OF COUNSEL:

HON. GLENN T. SUDDABY         TERRENCE M. KELLY, ESQ.
United States Attorney            THOMAS A. CAPEZZA, ESQ.
Northern District of New York     Assistant U.S. Attorneys
P. O. Box 7198
100 South Clinton Street
Syracuse, New York  13261-5165

JAMES E. LONG, ESQ.
Attorney for Defendant John E. Howard, III
668 Central Avenue
Albany, New York 12206

CASTILLO & ASSOCIATES         GASPAR M. CASTILLO, ESQ.
Attorneys for Defendant Redmond Andre McKinnon
817 Madison Avenue
Albany, New York 12208-3302

MARCIA G. SHEIN, ESQ.
Attorney for Defendant Redmond Andre McKinnon
2392 N. Decatur Rd.
Decatur, GA 30033

OFFICE OF THE FEDERAL
   PUBLIC DEFENDER                              PAUL J. EVANGELISTA, ESQ.
Attorney for Defendant William Pendelton
39 North Pearl Street, 5th Floor
Albany, New York 12207

MICHAEL A. FEIT, ESQ.
Attorney for Defendant Roland Riggins
383 Clinton Avenue
Albany, New York 12206

RICHARD L. MOTT, ESQ.
Attorney for Defendant Glenn Smith, Jr.
600 Broadway
Albany, New York 12207

DAVID L. GRUENBERG, ESQ.
Attorney for Defendant Daniel Williams
54 Second Street
Troy, New York 12180

DENNIS B. SCHLENKER, ESQ.
Attorney for Defendant Kenneth Gibson
174 Washington Avenue
Albany, New York 12210

KINDLON & SHANKS, P.C.                          TERENCE L. KINDLON, ESQ.
Attorneys for Defendant Christopher Restifo     KENT B. SPROTBERY, ESQ.
74 Chapel Street
Albany, New York 12207

EUGENE Z. GRENZ, ESQ.
Attorney for Defendant Santiago Castillo
113 Great Oaks Boulevard
Albany, New York 12203-5954

RAMON W. PAGAN, ESQ.
Attorney for Defendant Affis Cruz
2460 Williams Bridge Road
Bronx, New York 10469

TELESFORO DelVALLE, JR., ESQ.
Attorney for Defendant Julio Sierra
41 Madison Avenue
New York, New York 100010-2202

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

The defendants were charged with narcotics trafficking offenses in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1), following an investigation using, inter alia, interception of telephone calls pursuant to eavesdropping warrants. An extensive background regarding the investigation, including the applications for the eavesdropping warrants, is set forth in the May 3, 2005, Memorandum-Decision and Order. See United States v. Howard, __ F. Supp. 2d __, 2005 WL 3159606, at *1-11 (N.D.N.Y. May 3, 2005). The omnibus relief sought by the defendants, with the exception of the warrantless search of the vehicle occupied by defendants John E. Howard III ("Howard") and Christopher Restifo ("Restifo"), was denied. See id. at *26-27. Familiarity with the prior decision is assumed.

On May 26, 2005, Howard filed a motion for reconsideration of the denial of suppression regarding the eavesdropping warrants. Defendant Glenn Smith, Jr. ("Smith") filed a similar motion on June 9, 2005, and joined Howard's motion with permission of the court. Defendant Kenneth Gibson ("Gibson") also joined Howard's motion with permission. The government opposed.

A hearing regarding the motions to suppress the fruits of the warrantless vehicle search brought by defendants Howard and Restifo was held on June 1, 2005, in Utica, New York. Decision was reserved. Howard filed a post-hearing brief on June 8, 2005. On June 15, 2005, the government filed a responsive brief.

On September 14, 2005, defendant Daniel Williams ("Williams") filed a motion to suppress the fruits of a warrantless search of his vehicle.  The government opposed.  Oral argument was heard via video conference between Utica, New York, and Albany, New York, on September 30, 2005.  Decision was reserved pending a suppression hearing.  The suppression hearing was held on November 9, 2005, in Utica, New York.  Decision was reserved.  With permission, the government and Williams filed post-hearing briefs on December 12, 2005.

On October 10, 2005, defendant Redmond Andre McKinnon ("McKinnon") filed a motion for reconsideration of the denial of suppression of the fruits of the eavesdropping warrants issued on April 21, 2004, and May 20, 2004.  The government opposed and McKinnon filed a reply in further support.  All of the reconsideration motions were taken on submission without oral argument.

## II.  BACKGROUND

Only the facts necessary to decide the instant motions which were not set forth previously are set forth below.  Thus, the factual underlayment for the eavesdropping warrants is not repeated.  Again, reference is made to the extensive factual background set forth in the May 3, 2005, Memorandum-Decision and Order.  See id. at *1-11.

### A.  Howard and Restifo Vehicle Search

New York State Police Investigator Melissa Noll ("Investigator Noll") testified that she and other members of the investigatory team were assigned to surveil Howard on the morning of May 20, 2004.  This physical surveillance was arranged in anticipation of Howard going to Woodbury Commons, a large outlet shopping complex north of New York City, to conduct a narcotics transaction.

Investigators predicted the narcotics transaction on that day based upon, generally, the investigation and wiretap results up to that date, and, specifically, three telephone calls on May 19 and 20, 2004.  The first of these calls occurred at 1:50 p.m. on May 19, 2004. New York State Police Senior Investigator Samuel Mercado ("Investigator Mercado") opined that during this call Restifo indicated to Howard that he was ready to purchase more cocaine from him if he was available.  (June 1, 2005, Tr. at 79-80.)  The second call took place at 2:29 p.m. the same day.  Investigator Mercado opined that during this call Howard indicated to defendant Santiago Castillo ("Castillo") that he was ready to purchase more cocaine.  Id. at 80-81.  Castillo indicated that they should meet at the store, a location where they had previously met (Woodbury Commons).  Id. at 81.  Further, Howard indicated that he wished to purchase four kilograms of cocaine.  Id. at 81-82.  The third call occurred on May 20, 2004, at 10:09 a.m.  Howard called Castillo asking if he could leave now.  (Ex. 11.)  Castillo said all right.

Investigator Noll and the other members on the investigation were in constant contact, updating each other about their observations.  Investigator Mercado, who was Investigator Noll's supervisor, monitored the investigation, including both the physical surveillance and telephone call interceptions, from the location where the telephone intercepts were conducted.

Investigator Noll recounted the physical surveillance up until the traffic stop. Investigator Mercado's description of the stop follows.

At approximately 10:30 a.m. May 20, 2004, Howard left his residence at 514 Paige Street, Schenectady, New York, driving a gray/silver 2000 Acura with New York license plate number CNR 5596.  He stopped at a bank, then reentered his vehicle and drove east on

Albany Street in Schenectady.  At that time the whole surveillance team lost sight of him.
Despite attempts to relocate him in the local area, the officers were unable to do so.  They
then set up stationary positions designed to pick up the surveillance when he entered the
New York State Thruway ("the Thruway") heading south.

At approximately 11:56 a.m. Howard was observed entering the Thruway at the
Schenectady exit.  He proceeded south toward New York City.  He was driving the same
vehicle, but he now had a passenger.  It was later determined that this passenger was
Restifo.

The investigatory team surveilled Howard and Restifo to Woodbury Commons,
about 1-1/2 hours south of Albany.  They arrived at the shopping complex at approximately
1:25 p.m. and the investigators set up a stationery surveillance.  Howard and his passenger,
Restifo, exited the Acura and walked toward one of the stores.  They returned to the Acura at
approximately 4:03 p.m. and then stayed in the vehicle.

At approximately 4:45 p.m. a goldish tan Lexus sport utility vehicle arrived and
parked in front of Howard's Acura, nose to nose.  Howard exited the Acura, then sat in the
passenger seat of the Lexus for three to four minutes.  He then returned to the Acura and
retrieved a black knapsack-type bag by reaching through the front driver's side door.  He took
the bag and again sat in the front passenger seat of the Lexus.  After a couple of minutes, he
exited the Lexus; returned to the Acura and retrieved a small black object (possibly a cellular
telephone), again by reaching in to the car; and re-entered the Lexus.  After about four
minutes, Howard exited the Lexus carrying the same black bag.  He placed the black bag in
the trunk of the Acura and walked to the passenger side of the vehicle.  Restifo exited the

passenger seat and re-entered on the driver's side of the Acura.  The Acura then left Woodbury Commons, with Restifo now driving and Howard occupying the passenger seat.

Howard and Restifo then proceeded north on the Thruway, followed by the surveillance team of approximately six to eight vehicles.  The Lexus left Woodbury Commons at the same time but was not surveilled.

Upon receiving the information that an exchange was made, Investigator Mercado and the other supervisors of agencies cooperating in the investigation conferred.  They decided to conduct a ruse to lure Howard and Restifo away from the Acura, leaving it unlocked, so that the vehicle could be searched by law enforcement personnel.  They did not determine whether or not to arrest Howard and Restifo if cocaine were found in the vehicle. Rather, they would remain flexible and determine whether to make an arrest based upon how the situation transpired.  For example, they would consider whether the individuals were armed with handguns, if they attempted to flee the scene, if they tried to destroy or get rid of evidence, and the amount of cocaine found (more or less than the anticipated four kilograms).  A determination about arrest was to be made as the situation developed. Investigator Mercado was inclined not to arrest Howard and Restifo, but to only secure the evidence and decline prosecution until a later time.

At the 84.5 mile marker, about one hour north of Woodbury Commons, Howard and Restifo were pulled over by two uniformed New York State troopers.  The stop took place at about 6:00 to 7:00 p.m.  The troopers said that they were investigating a complaint of road rage involving a vehicle fitting the description of the Acura.  They asked Howard and Restifo to come with them to the nearby trooper barracks to clear up the matter.  The vehicle

was surreptitiously tampered with so that the vehicle would remain unlocked even if Howard and Restifo attempted to lock it.

Howard and Restifo accompanied the troopers to the barracks, leaving parked on the side of the Thruway what they believed was their locked Acura.  At the barracks, troopers purportedly investigating the road rage incident interviewed the defendants.  Both remained cooperative while at the barracks.

Meanwhile, members of the investigatory team searched the Acura.  Additionally, one member from the United States Drug Enforcement Agency and one from the New York State Police released the trunk using the latch inside the vehicle and searched the trunk. They retrieved a black bag matching the description Investigator Noll used when she observed Howard place a bag in the trunk of the Acura at Woodbury Commons.  Inside the bag they found about one kilogram of cocaine in a sealed package, and a black plastic shopping bag that contained about eight ounces of cocaine hydrochloride.  They also found a smaller zip-close baggie containing $20,100.00 in United States currency.  These items were retained as evidence.

As directed by Investigator Mercado and the other supervisors, the investigators who conducted the search of the vehicle attempted to make it appear as though a third party had stolen items from the vehicle while it was left unattended along the Thruway.  For example, they broke a cue stick and tried to pry open the glove compartment with it.  The glove compartment was damaged and appeared as if there had been an attempted break-in.

After Investigator Mercado was informed that the site of the vehicle was cleared of investigators, he permitted the uniformed troopers to return Howard and Restifo to their

vehicle.  Approximately thirty to forty minutes transpired while Howard and Restifo were away from their vehicle (at the barracks).

Howard and Restifo re-entered the Acura and proceeded north on the Thruway. They later pulled over, exited the vehicle, and looked in the trunk.

At no time during this incident did anyone involved in the investigation attempt to obtain a search warrant.  Neither Howard nor Restifo was arrested at that time and they remained unaware of the actual events involving the Acura up to the time of the suppression hearing.

### B. Williams Vehicle Search

Investigator Mercado, as one of the senior individuals directing the investigation, testified that he was aware of Williams' involvement in drug trafficking from the ongoing investigation--cooperating individuals had identified him as being involved in transactions, one individual stated that Williams was in possession of large (kilogram) quantities of cocaine, and Williams had a history of at least two drug crimes.

Investigator Mercado pointed to three intercepted telephone calls indicating that Williams was to travel to New York City on June 1, 2004, and return with a quantity of cocaine.  Investigator Mercado opined about the content of these calls as follows.

The first call took place on April 23, 2004, at approximately 9:45 p.m., between defendant McKinnon and Williams.  During this call they discussed the quality of two and three kilograms of cocaine, Williams stating that the quality of two was very good, and the quality of the third was uncertain because it had not yet been unwrapped.

The second call, also between McKinnon and Williams, was intercepted on April 28, 2004.  During this call McKinnon relayed to Williams that the price of a kilogram of

cocaine purchased from co-defendant Affis Cruz ("Cruz") would be $25,000.  McKinnon

indicated that Howard had said that the price of a kilogram of cocaine was $24,800, from a

different supplier.  Williams stated that he was "tinkering in his lab" indicating that he was

changing cocaine into crack cocaine or bagging cocaine hydrochloride into smaller packages

for resale.

The third call took place on May 31, 2004, at 2:28 p.m.  Williams placed this call to

Cruz.  In the call, he told Cruz he wanted four kilograms of cocaine and he would be

prepared to pick them up the next day, June 1, 2004.

Based upon these three calls and the other background information, Investigator

Mercado set up surveillance at Williams' place of work beginning at 4:30 a.m., on June 1,

2004, in anticipation of his work shift ending at about 6:00 a.m.  He testified about the

surveillance, both from his own participation and from the other investigatory team members'

reports to him.  Dennis R. Tomasone, New York State Attorney General Organized Crime

Task  Force Senior Investigator, testified regarding his part in the surveillance of Williams on

that day.

Williams was observed leaving his workplace at about 6:00 a.m. driving a black

GMC Envoy.  The Envoy was surveilled for some time before investigators lost contact for a

few minutes.  The Envoy was then observed parked unattended at 41 Elder Street in

Schenectady, Williams' mother's residence.  Investigator Mercado then had investigators run

a check on any vehicles registered to his mother.  They discovered that a gold four door

Dodge Stratus was registered to her.  When the investigators did not locate the gold Stratus

at that residence, and when Williams' mother was later observed driving the black GMC

Envoy, Investigator Mercado deduced that possibly Williams was driving his mother's gold Dodge Stratus.

Investigator Mercado also testified about three other intercepted telephone calls, giving his opinion of their content.  On June 1, 2004, at 5:46 p.m. McKinnon called defendant William Pendelton ("Pendelton").  Pendelton was in the New York City area attempting to procure narcotics.  McKinnon provided Pendelton with Cruz's telephone number and address, so that Pendelton would obtain drugs for himself and for McKinnon while in New York City.

At 6:24 p.m. Williams called McKinnon.  Williams was at Cruz's business, where he had been waiting since 1:00 p.m.  They also talked about how Pendelton was supposed to be there.  Williams said that he had come down for four kilograms of cocaine but had only received two.  Williams noted that Pendelton probably will not be able to obtain cocaine from Cruz.  McKinnon then asked a favor of Williams when he arrived home:  to get some of the cocaine Williams obtained, which McKinnon would pay for when he received it.

Still on June 1, 2004, at 9:30 p.m., Williams again called McKinnon, this time complaining that although Cruz indicated he was ready to provide four kilograms of cocaine, he only provided two kilograms.  McKinnon also attempted to ascertain if Pendelton was still in New York City, or if he had left when Williams did.  Williams continued to complain about receiving only half the amount of cocaine which he was prepared to purchase, and McKinnon noted that Pendelton got none.  Williams indicated that it would take him about two and one-half hours to get back to Schenectady.

Based upon these telephone calls, Investigator Mercado and the other supervisors of the investigation decided to set up surveillance northbound on the Thruway.  At this point

they had not determined whether they would arrest Williams upon stopping him.  Again, as with Howard and Restifo, they would remain flexible and consider Williams' cooperation and attitude regarding the stop, whether he tried to flee or destroy evidence, whether any type of firearm or handgun was located in the vehicle, and the amount of drugs and/or currency found.

Again, a ruse was devised so that Williams' vehicle would be left unattended by him and unlocked so that investigators could conduct a search.  The office of the United States Attorney apparently acquiesced to this plan and indicated to Investigator Mercado that he could secure the items and prosecution would be declined at that time.

At about 10:40 p.m. the surveillance teams located Williams at a rest area, driving a gold Stratus that was registered to his mother.  At Investigator Mercado's direction two uniformed New York State Troopers stopped Williams' vehicle at northbound mile marker 131.7, in Albany County.  Upon the trooper's approach to the vehicle, Williams identified himself by providing his drivers license.  The troopers, having been instructed by Investigator Mercado, proceeded to bring Williams to the trooper barracks at Exit 23 purportedly for the investigation of alleged criminal activity, this time a drive-off at a gas station.  This make-believe crime was purportedly perpetrated by someone in a vehicle matching the description of the gold Stratus Williams was driving.  As with Howard and Restifo, the troopers made sure that the vehicle was unlocked.

No attempt was made to obtain a search warrant.

After the troopers had Williams away from his vehicle, other members of the investigation team thoroughly searched the vehicle, including the trunk.  No inventory was made of the items in the vehicle and the car was not impounded.  Two kilograms of cocaine,

unwrapped, was found in the trunk.  Additionally, $50,000.00 in United States currency was located in the trunk.  Neither the cocaine nor the currency was secreted in the trunk.  The investigators seized the cocaine and the currency, then closed the trunk.  They secured the vehicle.  Upon notification from Investigator Mercado that the location of the vehicle was cleared, the uniformed troopers returned Williams to his car.  Williams was not placed under arrest and he was not told that his vehicle had been searched.

## III. DISCUSSION

### A. Reconsideration Regarding Eavesdropping Warrants

A motion for reconsideration is well-founded only "if 'there has been an intervening change in controlling law, there is new evidence, or a need is shown to correct a clear error of law or to prevent manifest injustice.'"  United States v. Robinson, 303 F. Supp. 2d 231, 232 (N.D.N.Y. 2004) (quoting United States v. Sanchez, 35 F.3d 673, 677 (2d Cir. 1994)), aff'd, __ F.3d __, No. 04-0889-CR, 2005 WL 3277921 (2d Cir. Dec. 5, 2005).  The sufficiency of the factual background set forth in the affidavits in support of the motions to suppress the wiretap evidence was extensively analyzed in the prior decision.  See Howard, 2005 WL 3159606, at *14-25.  There has been no showing of a change in controlling law, new evidence, or need to correct a clear error of law or to prevent manifest injustice.  See Robinson, 303 F. Supp. 2d at 232.  Accordingly, the motion for reconsideration will be denied.

### B. Vehicle Searches

Although the specific factual details of the searches of the Howard/Restifo vehicle and the Williams vehicle differ, the general scenario was the same.  Based upon the investigations up to the day of the search, and occurrences immediately prior, the

investigators believed that the defendants were going to obtain illegal narcotics, specifically cocaine, and transport the narcotics in their vehicles.  Uniformed officers were directed to pull over the defendants, telling the defendants a fabricated story that they were investigating a crime.  The officers then made sure the vehicle was unlocked and convinced the defendants to accompany them to the trooper barracks in furtherance of the investigation.  Members of the investigatory team then searched the unlocked vehicles, uncovering cocaine and cash.  The cocaine and cash were taken into evidence.  When the investigatory team was clear of the vehicle, the uniformed officers were notified and defendants were returned to their vehicles.  No search warrants were obtained, no vehicles were impounded and inventory searched, and no arrests were made.

The defendants argue that the warrantless vehicle searches violate the Fourth Amendment.  The government contends that probable cause existed to search the vehicles, and under the vehicle exception to the warrant requirement the searches were lawful.

Warrantless searches "are *per se* unreasonable under the Fourth Amendment-- subject only to a few specifically established and well/delineated exceptions."  Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S. Ct. 2022, 2032 (1971) (citing Katz v. United States, 389 U.S. 347, 357, 88 S. Ct. 507, 514 (1967)).  The government seeking an exception has the burden of showing that it is necessary.  Id. at 455, 91 S. Ct. at 2032.

The government contends that the automobile exception applies here.  It argues that in each case probable cause existed to believe that contraband in the form of cocaine was in the vehicles and therefore it was permissible to conduct a search without a warrant.

However, "'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears."  Id. at 461-62, 91 S. Ct. at 2035.  Rather, the exception was

developed based upon the rationale that an automobile used for the transportation of contraband goods became "somewhat as an offender" itself, making the securing of a warrant impractical because it could be rapidly moved to a different jurisdiction.  Id. at 458-60, 91 S. Ct. at 2034 (discussing development of the automobile exception in light of its role as "an almost indispensable instrumentality in large-scale violation" of prohibition).  The Court noted that all cases following establishment of the automobile exception to the warrant requirement recognized that there was

> "a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where *it is not practicable to secure a warrant*, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."

Id. at 459-60, 91 S. Ct. at 2034 (quoting Carroll v. United States, 267 U.S. 132, 153, 45 S. Ct. 280, 285 (1925)).  The Court noted that a warrantless search of a vehicle stopped on a highway was justified "where there is probable cause, because the car is 'movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained.'"  Id. at 460, 91 S. Ct. at 2035 (quoting Chambers v. Maroney, 399 U.S. 42, 51, 90 S. Ct. 1975, 1981 (1970) (emphasis added)).

In Coolidge, the suspect had gone to the police station to take a lie-detector test as requested by law enforcement personnel.  Id. at 446, 91 S. Ct. at 2027.  About two weeks later an arrest warrant was issued and the suspect was arrested at his home.[1]  Id. at 447, 91

---

[1]  A search warrant was also issued, by the State Attorney General who was the chief prosecutor of the crime.  Id. at 447, 91 S. Ct. at 2028.  The Supreme Court found that the warrant was invalid because it was issued by the "chief 'government enforcement agent' of the State" and not a neutral magistrate.  Id. at 450, 453, 91 S. Ct. at 2029, 2031.  Accordingly, the Court analyzed the search as if it had been conducted without a warrant.  Id. at 453, 91 S. Ct. at 2031.

S. Ct. at 2028.  A couple of hours later the police had Coolidge's vehicle towed from his

driveway to the police station.  Id.  Two days later the vehicle was searched.  Id. at 448, 91 S.

Ct. at 2028.  The Court rejected the government's attempt to justify the vehicle search based

upon the automobile exception.  Id. at 462, 91 S. Ct. at 2036.

First the Court noted that the role of the car in the crime had been known for quite a

time.  Id. at 460, 91 S. Ct. at 2035.  It also reasoned that Coolidge had known he was a

suspect in the crime but had cooperated in the investigation so there was no indication of an

intent to flee, and there had already been "ample opportunity to destroy any evidence he

thought incriminating."  Id.  The vehicle was not being used for an illegal purpose when it was

seized, and since it was regularly parked in the driveway the opportunity to search it was not

"fleeting."  Id.  The items sought during the search were "neither stolen nor contraband nor

dangerous" and a police guard was posted at the house over night.  Id. at 460-61, 91 S. Ct.

at 2035.  Also, the Court rejected the inherent mobility of the vehicle as significant in the

constitutional analysis, noting that personal items such as suitcases and briefcases are

"equally movable."  Id. at 461 n.18, 91 S. Ct. at 2035.  The Court recognized that "if there

[had been] a criminal suspect close enough to the automobile so that he might get a weapon

from it or destroy evidence within it," a search of appropriate scope could be conducted

without violating the Constitution.  Id.  The Court found that "by no possible stretch of the

legal imagination can this be made into a case where 'it is not practicable to secure a

warrant.'"  Id. at 462, 91 S. Ct. at 2036 (quoting Carroll, 267 U.S. at 153, 45 S. Ct. at 285).

Assuming arguendo that there was probable cause to search each vehicle, it must

be determined if, under the circumstances, it was "not practicable to secure a warrant."  Id. at

460, 91 S. Ct. at 2034.  Unlike the vehicles in Coolidge, here the vehicles were stopped on a

public highway.  However, the suspects (Howard/Restifo and Williams) were not aware of the surveillance of them by law enforcement.  In fact, they were led to believe that there was an investigation of a totally different sort in progress:  in one instance, a road rage incident and in the other a gas drive-off.  Howard and Restifo were totally cooperative with the uniformed officers, as was Williams.  Their cooperation extended to leaving their (ostensibly locked) vehicles on the Thruway to accompany the officers to the trooper barracks to aid in the purported investigations.  The vehicles were at all times under the visual surveillance of the investigatory teams or under the total control and physical possession of the investigatory teams.  The opportunity to search could not be said to be "fleeting," as the defendants were cooperating in the investigations at the barracks, and even if they had wished to stop cooperating, the officers may have at that point decided to effect an arrest or simply refused or delayed in transporting the defendants back to their vehicles.  It is also notable that because the vehicles were under constant surveillance and had been for some time, investigators could have permitted the vehicles to continue northbound on the Thruway while a warrant was obtained.

Moreover, law enforcement was aware of their involvement in the narcotics conspiracy for quite some time.  With regard to the specific transactions, ample time was available to obtain a warrant.

With regard to Howard, investigators had known of his contact with the alleged narcotics trafficking conspiracy centered around McKinnon by April 26, 2004, through intercepted telephone conversations.  Several of the conversations involving Howard pertained to narcotics transactions, according to Investigator Mercado.  On May 19, 2004, at 1:50 p.m. a call was intercepted that indicated to the investigators that Howard was planning

- 17 -

a narcotics transaction.  This and two other calls that ensued within the next 20 hours led the investigators to plan a surveillance of Howard.  Surveillance continued from 10:30 a.m. on May 20, 2004, until the traffic stop by the uniformed officers at 6:00 to 7:00 p.m., eight to nine hours later.  Further, one to two hours transpired between observation of the alleged narcotics transaction and the traffic stop.  There is no way that it could be said that insufficient time had elapsed in which to present the facts to a neutral magistrate and obtain a search warrant.

Similarly, Williams was identified as an alleged participant in the narcotics trafficking conspiracy well before the vehicle search was carried out.  As early as April 23, 2004, a telephone conversation was intercepted between Williams and McKinnon during which they allegedly discussed the quality of kilogram quantities of cocaine.  A call took place on April 28 between McKinnon and Williams, allegedly discussing the prices of kilogram quantities of cocaine.  At 2:28 p.m. on May 31, 2004, Williams placed a call to Cruz, allegedly discussing the purchase of four kilograms of cocaine on the next day.

Based upon these intercepted telephone calls surveillance was arranged at Williams' workplace beginning at about 4:30 a.m. on the morning of June 1, 2004.  Although investigators did not continually surveil Williams or observe an alleged narcotics transaction, they deduced that he may be driving a gold Dodge Stratus registered to his mother and by about 6:30 p.m. he was procuring two kilograms of cocaine in New York City.  Thanks to an intercepted telephone call investigators determined that Williams was leaving New York City at about 9:30 p.m. to return to Schenectady, a two and one-half hour trip to the north.  At this point, about 16 hours had elapsed since the surveillance started.  At least several hours

elapsed between when it was deduced that Williams was in the process of purchasing

cocaine in New York City and probably was driving a gold Stratus, and when his vehicle was

stopped.  It was almost an hour between when investigators positively identified Williams

driving the gold Stratus at the northbound Plattekill rest area and when he was stopped by

the uniformed officers.  At that point, Williams accompanied the officers to the barracks and

from that point forward was under the complete control of the officers while his vehicle was

fully secured by the investigatory team on the Thruway.  Thus, there was no chance that

opportunity to conduct a search would be lost.

Finally, during the time when the ruse was being developed, Investigator Mercado

contacted the office of the United States Attorney and discussed his plan with them.  As with

the Howard and Restifo search, it cannot be said that insufficient time was available in which

a warrant could be obtained.

Additionally, as the Coolidge Court determined, the inherent mobility of the vehicles

in these circumstances is insufficient to justify a warrantless search.  See 403 U.S. at 461

n.18, 91 S. Ct. at 2035.  Neither of the drivers or the passenger were close enough to the

vehicles to obtain a weapon from within them or to destroy the evidence found in the trunk.

In fact, all of the individuals were removed from the scenes by uniformed officers and kept at

the trooper barracks a number of miles away from their vehicles until alerted by Investigator

Mercado that the individuals could be returned to their vehicles.  As was the case in

Coolidge, "by no possible stretch of the legal imagination can this be made into a case where

'it is not practicable to secure a warrant.'"  See id. at 462, 91 S. Ct. at 2036 (quoting Carroll,

267 U.S. at 153, 45 S. Ct. at 285).

The government relies upon Maryland v. Dyson, 527 U.S. 465, 467, 119 S. Ct. 2013, 2014 (1999) (per curiam), and its progeny in support of its argument that where probable cause exists, a warrantless search may be conducted absent exigent circumstances.  Indeed Dyson supports this proposition.  The Court stated the proposition thusly:  "'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.'"  Id. (quoting Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S. Ct. 2485, 2487 (1996) (per curiam) (emphasis added)).  In Dyson sheriffs deputies had probable cause to believe that a vehicle contained narcotics, they stopped the vehicle, searched it, and arrested the driver.  Id. at 465-67, 119 S. Ct. at 2013.

This, however, is not a simple case of probable cause, stop the vehicle, search, and arrest the driver.  A hallmark justification for the automobile exception is that the occupants of the vehicle are alerted to the search.  Coolidge, 403 U.S. at 460, 91 S. Ct. at 2035.  Thanks to the Fourth Amendment police do not have carte blanche to conduct searches and make seizures at their whim.  Rather, a neutral magistrate reviews the proposed activities of law enforcement to be sure that they are not unreasonable.  If what the officers propose is not supported by probable cause, the magistrate will deny the warrant.  Oversight of law enforcement activities to protect the populace from unreasonable searches and seizures is provided by requiring a warrant issued by a neutral magistrate.  This is precisely why any exception to the warrant requirement is narrowly drawn.  See id. at 443, 91 S. Ct. at 2032.  It is also one of the reasons why the automobile exception has been approved:  when the automobile is stopped, the driver is there to observe the search and may complain if it was unreasonable, whether because probable cause was lacking or for

- 20 -

some other reason.  Here, Howard, Restifo, and Williams had no opportunity to challenge the search on any grounds because they were unaware that it had even occurred.  There was no oversight of the law enforcement activities, either by a magistrate asked to issue a warrant or by the occupants of the vehicles.  This goes well beyond the scope of the automobile exception.  See id. at 462, 91 S. Ct. at 2036 (stating that the automobile exception was "simply irrelevant" under the facts of the case).

Moreover, as previously discussed, other facts also bring this case outside the ordinary probable cause, stop, search, and arrest circumstance.  The investigators knew for quite some time that the vehicles may be used to transport narcotics at the time in question, negating the criticality of the timing and opportunity to obtain a warrant.  Both vehicles were under surveillance for a significant period of time, negating the justification that there was a fleeting opportunity to search.  Further, both vehicles while parked on the Thruway were under the complete control of the investigatory teams, while the defendants were taken to the barracks.  There was absolutely no chance that either vehicle would be driven away until the uniformed officers were directed to return defendants to their vehicles.  Neither vehicle was "readily mobile."  See Dyson, 527 U.S. at 467, 119 S. Ct. at 2014.

The police cannot have it both ways.  Where there is probable cause, they may stop a vehicle and search it without offending the Fourth Amendment.  If contraband is found, they may seize it and arrest the occupants.  However, to lure the occupants away from the vehicle so that it can be searched and contraband
 seized, all unbeknownst to the occupants, crosses well past the line of reasonableness into the unreasonable.  Such practices, although imaginative and clever, cannot be sustained under the Fourth Amendment.

IV. <u>CONCLUSION</u>

In sum, this is <u>not</u> a case where it was "not practicable to secure a warrant." <u>See</u> <u>id</u>. Under the particular facts and unusual circumstance of this case, the warrantless searches of both the Howard/Restifo vehicle and the Williams vehicle were unreasonable, notwithstanding the automobile exception to the requirement for a warrant.

Reconsideration of the decision denying suppression of the fruits of the eavesdropping warrants is not justified as the moving defendants have not established that there has been an intervening change in controlling law, new evidence, or the necessity to correct a clear error of law or to prevent manifest injustice.

Accordingly, it is

ORDERED that

1.  The motions for reconsideration brought by defendants Redmond Andre McKinnon, John E. Howard, and Glenn Smith, Jr., and joined by Kenneth Gibson, are DENIED;

2.  Defendant John E. Howard's motion to suppress the fruits of the warrantless vehicle search on May 20, 2004, is GRANTED;

3.  The government is precluded from using as evidence against defendant John E. Howard any items, including cocaine and United States currency obtained in the May 20, 2004, vehicle search;

4.  Defendant Christopher Restifo's motion to suppress the fruits of the warrantless vehicle search on May 20, 2004, is GRANTED;

5.  The government is precluded from using as evidence against defendant Christopher Restifo any items, including cocaine and United States currency, obtained in the May 20, 2004, vehicle search;

6.  Defendant Daniel Williams' motion to suppress the fruits of the warrantless vehicle search on June 1, 2004, is GRANTED; and

7.  The government is precluded from using as evidence against defendant Daniel Williams any items, including cocaine and United States currency, obtained in the June 1, 2004, vehicle search.

IT IS SO ORDERED.

_____
United States District Judge

Dated:   December 30, 2005
         Utica, New York.